272

# UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

No. 99-40680

D.C. Docket No. B-96-CV-177

U.S. COURT OF APPEALS
**FILED**

FEB 1 4 2001

CHARLES R. FULBRUGE III
CLERK

RAQUEL O RODRIGUEZ; JOSE L RODRIGUEZ

        Plaintiffs - Appellees

  v.

RIDDELL SPORTS, INC; ET AL

        Defendants

RIDDELL SPORTS, INC; RIDDELL, INC; ALL
AMERICAN SPORTS CORPORATION, doing
business as Riddell/All American

        Defendants - Appellants

      Appeals from the United States District Court for the
        Southern District of Texas, Brownsville.

Before JOLLY, JONES, and SMITH, Circuit Judges.

## J U D G M E N T

     This cause was considered on the record on appeal and was
argued by counsel.

     It is ordered and adjudged that the judgment of the District
Court is reversed, judgment is rendered in favor of defendant
RSI, and the cause is remanded to the District Court for further
proceedings in accordance with the opinion of this Court.

     IT IS FURTHER ORDERED that plaintiffs-appellees pay to
defendants-appellants the costs on appeal to be taxed by the Clerk
of this Court.

ISSUED AS MANDATE: MAR 0 8 2001

A true copy
Test
Clerk, U. S. Court of Appeals, Fifth Circuit

By _Sabrina Barras_
Deputy
New Orleans, Louisiana MAR 0 8 2001

U.S. COURT OF APPEALS
FILED

FEB 1 4 2001

CHARLES R. FULBRUGE III
CLERK

Revised February 16, 2001

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

Nº 99-40680

---

RAQUEL O. RODRIGUEZ AND JOSE L. RODRIGUEZ,

Plaintiffs-Appellees.

VERSUS

RIDDELL SPORTS, INC., ET AL.,

Defendants,

RIDDELL SPORTS, INC.; RIDDELL, INC.;
AND
ALL AMERICAN SPORTS CORP.,
DOING BUSINESS AS RIDDELL/ALL AMERICAN,

Defendants-Appellants.

---

Appeals from the United States District Court
for the Southern District of Texas

---

Before JOLLY, JONES, and SMITH,
   Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Defendants, Riddell Sports, Inc. ("RSI"), Riddell, Inc. ("RI"), and All American Sports Corporation, doing business as Riddell/All American. ("AA"), appeal a judgment holding them strictly liable for a design defect in a football helmet worn by plaintiff Jose Rodriguez when he allegedly suffered a blow causing brain injury, and finding them liable for the bystander emotional distress suffered by Jose's mother, Raquel Rodriguez. Concluding that the district court erred in charging the jury and that, as a matter of law, no bystander claim was viable, we reverse, remand in part, and render in part.

## I.

In 1995, Jose was a football player at Los Fresnos High School. At the first football scrimmage of the year, he played both offense and defense and took more than twenty hits to his helmet. After making his last tackle, which witnesses described as a seemingly normal one, he got up, went to the huddle, and walked or jogged off the field to the bench, where he first sat, then lay down in front of the bench and lost consciousness.

Jose's mother, Raquel, was present in the stands during the scrimmage but did not see Jose's last tackle, see him leave the field, or see him lie down. Sometime later, she was told that he was lying on the ground, so she went down to the field and saw him unconscious and foaming at the mouth. Jose was taken to a hospital and diagnosed as having suffered a subdural hematoma, causing permanent brain injury and a permanent vegetative state.

## II.

Jose and his mother sued for product liability and bystander injury against the manufacturer of Jose's helmet. They asserted that a design defect in the VSR-4 helmet manufactured by RI and reconditioned by AA significantly increased the chance of impact-induced brain injury such as that Jose had suffered.

Defendants are separate but related corporations. RI manufactures the VSR-4 helmet; AA is an athletic equipment reconditioner; RSI is a holding company and the parent of RI and AA. The VSR-4 helmet Jose wore was manufactured by RI and purchased by the school district before the 1994 football season and was reconditioned by AA in early 1995. The helmet's liner contained cells of an energy-absorbing foam ("old" Rubatex 3952 foam) that plaintiffs claim was fabricated by RI in September 1993.

Plaintiffs assert that the helmet was manufactured and purchased in 1994. They base this contention on the fact that the number "94010677" stamped in the shell of the helmet meant the year 1994 and that the number "993" stamped in the liner meant September 1993. Defendants challenge this claim, arguing that the helmet may have been manufactured as early as 1992.

In 1994, RI received samples of a new energy-absorbing foam. It did some initial tests on the foam from February to May 1994 but did not test the foam again until October 1995, when it concluded that the new foam had better energy-absorbing qualities and began to use it in its helmets.

Plaintiffs claim that if Jose's helmet had contained the new foam or thicker pieces of the old foam, the injury would not have

CVisPDF - www.tevsia.com

occurred. Plaintiffs' biomechanical expert, Dr. Stalnaker, testified that the new foam would have reduced substantially the risk of a subdural hematoma. Therefore, Stalnaker characterized Jose's helmet as defective and unreasonably dangerous and, alternatively, opined that it could have been made safer simply by using less "comfort" foam and thicker pieces of the old energy-absorbing foam.

In response, RI's helmet designer stated that the helmet Stalnaker designed for demonstration at trial, with thicker energy-absorbing foam, was not practical. Stalnaker's design required removing most of the soft "comfort" foam and replacing it with hard energy-absorbing foam. RI's designer claimed players would not wear such a helmet, because it would be too uncomfortable. As to the claim that the new energy-absorbing foam should have been used in Jose's helmet, RI argued that it could not be used until testing was complete in October 1995—two months after Jose's injury.

Plaintiffs argued, however, that RI could have begun using the new foam much earlier, because RI had received its first samples of it in February 1994. RI disagreed, introducing evidence that it had sent the sample foam back to the supplier for the supplier to address some concerns RI had with it. RI also presented testimony that the producer of the new foam was not sure initially that it could supply the new foam consistently.

Nonetheless, plaintiffs alleged that the reason the new foam was not tested again until October 1995 was that RI wanted to use up its stock of old, inferior foam. The only evidence plaintiffs introduced to support these allegations was that RI canceled an order of the old foam in 1993. This occurred,

however, before RI had even received samples of the new foam.

Plaintiffs also argued that even if Jose's helmet was manufactured before RI received any new foam, the new foam could have been inserted by AA when it had Jose's helmet from December 1994 to May 1995 for reconditioning. Defendants denied that the new foam was available for use at that time and argued further that AA, as a mere service provider, had no obligation to upgrade Jose's helmet.

In addition to the products liability claim, plaintiffs assert a bystander claim on the theory that Raquel Rodriguez witnessed the manifestation of Jose's injury and, under Texas law, is entitled to recover for emotional distress. Defendants dispute the existence of any such bystander claim, because Raquel Rodriguez did not perceive both the accident and the manifestation of injury.

After plaintiffs rested, defendants moved for judgment as a matter of law ("j.m.l.") for insufficiency of the evidence on the design defect claim and as to the bystander claim. After both sides closed, the court deemed all motions timely reurged.

Defendants also objected to the jury charge, arguing that the questions—which referred to the defendants as one entity—could allow the jury to find for plaintiffs without their having proved their case against each defendant. The court denied the objection.

After the verdict, defendants reurged their motion for j.m.l. on the bystander claim. The court denied all pending motions and awarded Jose $9.9 million and Raquel $1.55 million.

## III.
### A.

Defendants contend the court erred as a matter of law in its jury charge by treating all the defendants as one entity and submitting questions on products liability as to parent RSI. It is undisputed that defendants objected to the charge before the case was submitted, in accordance with FED. R. CIV. P. 51. We review errors of law *de novo* but reverse a charging error only where "the charge as a whole leaves us with substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." *Stine v. Marathon Oil Co.*, 976 F.2d 254, 259 (5th Cir. 1992) (citation omitted).

Question One of the charge asked: "Was there a design defect in the VSR-4 football helmet at the time it left the possession of *Defendants* that was a producing cause of the injury in question? (Emphasis added.) Question Four, the other question referring to the defendants, asked: "Did the *Defendants'* actions rise to a level of willful or callous and reckless indifference to the safety or rights of others?" (Emphasis added.)[1]

---

[1] In explaining Question One, the court said:

Question Number 1 just outright ask [sic] you: Look, was the helmet when it left the possession of the defendant a producing cause of the injury in question? Was there something wrong with it when it left the defendant that produced—was the producing cause of the injury in question?

Later, in instructing the jury on damages, the court said:

It is your first task to decide whether the defendant is liable. I am instructing you on
(continued...)

The evidence showed that AA is a separate corporation from RI. Although both AA and RI are owned by RSI, a holding company, plaintiffs did not argue that defendants were alter egos, that they were agents of each other, or that the corporate veil should be pierced. Absent proof of one of these conditions, the corporate form must be respected. *See Lucas v. Tex. Indus., Inc.*, 696 S.W.2d 372, 374 (Tex. 1985).

Defendants argue that treating them as one entity was an error of law, because they are separate, and that the harm of this aggregation is that it allowed the jury to apply the strict liability standard—which applies only to manufacturers—to service provider AA and to RSI and allowed the jury to consider the helmet to be in the possession of the manufacturer—thus triggering a duty to upgrade—when it was merely at the shop of a service provider.

Plaintiffs respond that defendants cannot object to the combining of the defendants in the charge, because defendants invited the error by referring to themselves collectively. *See United States v. Baytank Inc.*, 934 F.2d 599, 606 (5th Cir. 1991).[2] Defendants dis

---

[1](...continued)
damages—on damages only so that you will have guidance in the event you decide that the defendant is liable and that the plaintiff is entitled to recover money from the defendant.

[2] Plaintiffs make a material misrepresentation to bolster their claim that no harm occurred from combining the defendants. Plaintiffs state that "[d]efendants' counsel represented at trial that his three clients, including Riddell Sports, jointly manufactured the helmet." The portion of the record that plaintiffs cite in support of this contains nothing of the sort, nor could we find any such
(continued...)

CM/PDF - www.texia.com

agree, saying that plaintiffs take defendants' comments out of context and that defense counsel said "defendant" only when referring to a particular defendant, usually RI.

A thorough review of the record shows that defendants did not object as often as they could have when plaintiffs referred to them as one entity and that defense counsel, from time to time, may have been a bit sloppy in his references to defendants.[3] Nonetheless, the evidence is plain that the three defendants were distinct corporations.

Further, it is plaintiffs' duty to prove each element of their *prima facie* case. Thus if combining two corporations into one is necessary to apply a strict liability standard, then plaintiffs must prove that the corporations should be combined, and sloppiness on the part of defendants does not excuse plaintiffs from this burden.

Plaintiffs argue, alternatively, that it was harmless error for the court to combine all three defendants, because defendants have common stockholders and common insurance coverage. Thus, according to plaintiffs, it does not matter which defendant is found liable, because the same insurance company will pay.

This is not enough to disregard the corporate form, however. Under plaintiffs' theory, there would be no point in having separately incorporated subsidiaries, because merely having common stockholders or

insurers would be enough to allow the corporate form to be disregarded. Moreover, plaintiffs do not address defendants' argument that aggregating the defendants allowed the jury to treat AA's possession of the helmet as equivalent to RI's possession and control of it—triggering the duties and liabilities that apply to a manufacturer instead of those that apply to a service provider.

B.

Under Texas law, a manufacturer is strictly liable for a design defect if a product was unreasonably dangerous when it left its control. *Bell Helicopter Co. v. Bradshaw*, 594 S.W.2d 519, 531 (Tex. Civ. App.—Corpus Christi 1979, writ ref'd n.r.e.); RESTATEMENT (2D) OF TORTS § 402A.

> If the product is not unreasonably dangerous at the time it leaves the manufacturer's control, the manufacturer does not become strictly liable for damages if the product subsequently becomes unreasonably dangerous unless the manufacturer regains a significant degree of control of the product, and the product is then determined to be unreasonably dangerous before the manufacturer loses control of the product.

*Bell Helicopter*, 594 S.W.2d at 531; *Otis Elevator Co. v. Bedre*, 758 S.W.2d 953 at 955 (Tex. App.—Beaumont 1988), *aff'd in part and rev'd in part*, 776 S.W.2d 152 (Tex. 1989).[4]

"We evaluate whether a product has a de-

---

[2](...continued)
representation elsewhere in the record.
   [3] Part of the confusion likely was caused by the fact that AA did business as Riddell/All American.

[4] *See also Dion v. Ford Motor Co.*, 804 S.W.2d 302, 311 (Tex. App.—Eastland 1991, writ denied).

sign defect in light of the economic and scientific feasibility of safer alternatives." *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 384 (Tex. 1995) (citing *Boatland, Inc. v. Bailey*, 609 S.W.2d 743, 746 (Tex. 1980)). "The degree of feasibility is one factor courts weigh in balancing the utility of a product versus its risks." *Id.* (citing *Turner v. Gen. Motors Corp.*, 584 S.W.2d 844, 846, 849 (Tex. 1979). "However, if there are no safer alternatives, a product is not unreasonably dangerous as a matter of law." *Id.* (citing *Boatland*, 609 S.W.2d at 748). "Texas law does not require a manufacturer to destroy the utility of his product in order to make it safe." *Hagans v. Oliver Mach. Co.*, 576 F.2d 97, 101 (5th Cir. 1978).

Defendants contend that the jury may have found strict liability in either of two ways, one of which would have been based on legal error. On one hand, the jury may have given credence to plaintiffs' evidence that Jose's helmet was unreasonably dangerous at the time of its design or by the time it was sold. The jury may have believed Stalnaker's testimony that the helmet could have been made safer at the time of its design in 1992 merely by inserting more energy-absorbing foam and using less comfort foam. If the jury reached this conclusion of fact, its verdict would be unassailable, because, by law, if a safer alternative design existed at the time of manufacture and sale, then the product was unreasonably dangerous.

On the other hand, if the jury did not believe that a safer alternative existed when the helmet was sold, it must have found liability under a legally erroneous theory. The jury may have believed defendants' design witness, who testified that Stalnaker's design was infeasible because removing the comfort foam to add more hard, energy-absorbing

foam would make the helmet so uncomfortable that no one would want to wear it.

If this were the case, the jury, to reach its finding of liability, must have believed that as soon as RI completed its first round of tests on the new foam in May 1994—seventeen months before RI manufactured any helmets using the new foam—a safer alternative design had become available. The jury further must have believed—because the jury instruction referred to all three defendants as one—that when AA (the reconditioner) had Jose's helmet in May 1995, it was the same as if RI (the manufacturer) had the helmet, and therefore there was a duty to substitute the new foam that RI had in sample form, because the new foam constituted a safer alternative design.[5]

---

[5] Plaintiffs exhaustively urged this theory to the jury; they combined all of the defendants to argue on closing:

What happens in between their receipt of the new foam in February of '94 and the time that they finally drop tested it? They had Joe Rodriguez' helmet in their hands. They sent a representative out to Los Fresnos High School and they said, "Let us take care of your helmets. We will take them back from you." . . .

And what did they do? They took it back, they charged Los Fresnos High School money and they returned it to them on May 11, 1995, with the representation on a stamp right here, . . . that says that this is a recertified helmet in accordance with the NOCSAE standards. The representation that they made to the coaches at Los Fresnos High School and indirectly to the players like Joe Rodriguez
(continued...)

6

This would have been error, because under Texas law a maintenance contract does not impose on the contractor responsibility for design defects or to upgrade a product. *See Muniz v. Ransomes Am. Corp.*, 921 F. Supp. 438, 442 (S.D. Tex. 1995), *aff'd*, 81 F.3d 154 (5th Cir. 1996). In fact, even if, hypothetically, plaintiffs had made a negligence claim against AA for not using the new foam, to maintain the action the contractor must have a duty to enhance the product. AA's contract with the school specifically said that it did not have that duty: "[AA] does not undertake to change or modify the design, construction, material or fitness of the athletic equipment herein listed, it's [*sic*] only obligation being to recondition such equipment as herein specified."

Plaintiffs disagree, arguing that RI regained significant control over the helmet when AA took it in for reconditioning: "As the authorized agent and sister company of Riddell, the VSR-4 helmet is deemed to have left the hands of Riddell on the same day it left the hands of All American with insufficiently thick, inferior 'old' foam." Plaintiffs introduced no evidence that the VSR-4 is the authorized agent or sister company of RI. We assume, though, that plaintiffs meant to argue

that RI and AA have such a unique relationship that RI regained a significant degree of control over the helmet when AA reconditioned it, thus subjecting RI to strict liability because the safest available foam was not used.

Plaintiffs rely heavily on *Bell Helicopter*, in which plaintiff claimed that a helicopter had an unreasonably dangerous tail rotor blade. Although the court found that the blade was not unreasonably dangerous when it initially left Bell's control in 1961, the court held that Bell regained "a significant degree of control" of the helicopter when Houston Helicopters, a Bell service station, acquired title to the helicopter in 1969. *Bell Helicopter*, 594 S.W.2d at 530.

In 1970, Bell learned that the tail rotor blade was dangerous and began a program to replace it. The helicopter at issue, however, was never refitted with an improved blade; Houston Helicopters sold the helicopter to the plaintiff in 1973. The court held as a matter of law that Bell had control of the helicopter, for strict liability purposes, when Houston Helicopters owned it, because of "the unique relationship between the service stations and Bell." *Id.* at 531.

---

[5](...continued)
and to their brothers and sisters like Carmen and Diana and Juan.

The representation was, this is the best helmet that technology can make. That's what they are telling the world, ladies and gentlemen, when they put this thing back on the marketplace on May 11th, 1995.

And what was it really? It wasn't even the best foam that they had sitting on their shelves.

Although Bell did not possess the actual power of the FAA to require owners to replace the 102 system with the 117 system, as a practical matter, it could accomplish the same result through its service stations. All of Bell service stations were required to adhere to and comply with all Bell-issued service bulletins or safety notices regarding Bell-made component parts, the servicing of same, or the replacement thereof. Had Bell demanded a replacement of the 102

system with the 117 system or delivered an adequate notice concerning the unreasonably dangerous condition of the 102 system during the time the helicopter remained in the possession of Houston Helicopters, the latter would have complied with Bell's directive.

*Id.*

Defendants contend that *Bell Helicopter* is not determinative and that this case is more like *Dion v. Ford Motor Co.*, 804 S.W.2d 302 (Tex. App.—Eastland 1991, writ denied), which distinguished *Bell Helicopter* and ruled that a manufacturer had not regained a "significant degree of control" of a tractor so as to subject it to strict liability. In *Dion*, a plaintiff sued for damages incurred when his Model 8N tractor rolled over and crushed him; he argued that the tractor was unreasonably dangerous because it did not have a rollover protection system. The court held that the tractor was not unreasonably dangerous when it was manufactured in 1950, because no tractors manufactured at that time had rollover protection systems.

As technology improved, all Ford tractors were built with rollover protection systems, and Ford began manufacturing sub systems that could be placed on the Model 8N. The court noted that, like the plaintiff in *Bell Helicopter*, Dion had his tractor serviced at a service station authorized by the manufacturer; no one at the station told him that he should have a rollover protection system installed. The court distinguished *Bell Helicopter*, pointing out that "McMaster Ford never took title to the tractor, and Ford never issued any replacement program for the 8N tractor." *Id.* at 311. The court concluded that "Ford did not regain a 'significant degree of control' as

required by *Bell Helicopter Company*." *Id.*[6]

"Whether a duty exists under a given set of facts and circumstances is essentially a question of law for the trial court." *Id.* (citations omitted). We review questions of law *de novo*. *Stine v. Marathon Oil Co.*, 976 F.2d 254, 259 (5th Cir. 1992).

Our task, therefore, is to determine whether the instant facts are more similar to those in *Bell Helicopter* or to those in *Dion*. If the former, then as a matter of law the manufacturer regained a "significant degree of control" and is strictly liable. If the latter, then strict liability does not apply to the reconditioning of the helmet.

---

[6] The *Dion* court also relied on *Otis Elevator Co. v. Bedre*, 758 S.W.2d 953, 955 (Tex. App.—Beaumont 1988), *rev'd on other grounds*, 776 S.W.2d 152 (Tex. 1989) (per curiam), another case distinguishing *Bell Helicopter*, in which the court made the following factual distinction:

In this case, the Otis elevator in question had not been sent back to an Otis maintenance and repair shop; nor had the elevator been placed in one of Otis' own authorized service stations. Otis had not regained possession or title to the elevator in question; nor had Otis issued any direct, unequivocal orders or authorizations to replace certain parts or systems on the elevator. In *Bell Helicopter* . . ., these compelling, paramount facts existed.

Furthermore, no jury finding exists that the elevator in question was defective when it left the possession of Otis and entered into the stream of commerce. In fact, Otis lost control and possession of the elevator when it was sold in 1961. Otis never regained control or possession in the same manner as did Bell Helicopter Company.

8

The facts of this case are more similar to those in *Dion*; indeed, they are almost identical. As in *Dion*, RI manufactured and sold the product, at which point it lost control of it. Then, some time later, an authorized service provider serviced the helmet without ever taking title to it. Further, RI instituted no program to replace the old foam with the new. In fact, RI had not even begun to use the new foam itself.

Thus, as a matter of law, RI never regained the "significant degree of control" required to make it strictly liable for the helmet when it was in AA's shop for servicing.[7] If the jury found RI strictly liable for AA's failure to improve the helmet, this was legal error.

As we have said, we vacate a jury award if the jury charge as a whole leaves substantial and ineradicable doubt whether the jury has been properly guided. *See Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 614 (5th Cir. 1999). We do not reverse where the jury instructions contain mere factual errors; instead, we assume the jury considered all the evidence in reaching its decision. *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 126 (5th Cir. 1992).

When the court erroneously instructs a jury on the law, however, the jury may correctly apply the facts to the incorrect legal standard in making its decision. Therefore, if a jury

could find liability according to multiple theories, and one of them is erroneous, we reverse unless we can tell that the jury came to its decision using only correct legal theories. *Id.* If it is impossible to tell whether a correct theory has been used, we reverse for a new trial. *Id.*[8] Such is the case here.

## C.

The court also erred as a matter of law in allowing the case to go to the jury with regard to RSI. It is undisputed that RSI is a holding company and parent of RI and AA but does not produce anything or place anything in the stream of commerce. "Generally, a court will not disregard the corporate fiction and hold a corporation liable for the obligations of its subsidiary except where it appears the

---

[7] *Cf. Torres v. Caterpillar, Inc.*, 928 S.W.2d 233, 240-42 (Tex. App.—San Antonio 1996, writ denied) (assuming plaintiff bought a used forklift from an authorized dealer, but refusing to hold that the fact that the dealer acquired and resold the forklift without a rollover bar was enough to allow conclusion that the manufacturer had thus regained a "significant degree of control" to be held strictly liable).

[8] We explained in *Walther*, 952 F.2d at 126, that

[t]he Supreme court has said in the criminal context that "a general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground." *Zant v. Stephens*, 462 U.S. 862, 881 (1983); *see also Neubauer v. City of McAllen*, 766 F.2d 1567, 1575 (5th Cir. 1985). This principle has its origins in *Stromberg v. California*, 283 U.S. 359 (1931), where the Court reversed a conviction when one of three possible bases for the jury's verdict was unconstitutional. . . . In *Griffin v. United States*, 502 U.S. 46 (1991), [however,] the Court explained that the *Stromberg* rule should be applied only when jurors have been left the option of relying on a legally inadequate theory, not a factually inadequate theory.

(Parallel citations omitted.)

9

corporate entity of the subsidiary is being used as a sham to perpetrate a fraud, to avoid liability, to avoid the effect of a statute, or in other exceptional circumstances." *Lucas v. Tex. Indus., Inc.*, 696 S.W.2d 372, 374 (Tex. 1985) (citing *Torregrossa v. Szelc*, 603 S.W.2d 803 (Tex. 1980)).

"There must be something more than mere unity of financial interest, ownership and control for a court to treat the subsidiary as the alter ego of the parent and make the parent liable for the subsidiary's tort." *Id.* Nothing of this sort is even alleged, so it was an error of law not to dismiss RSI; we reverse and render judgment for that defendant.

## IV.

Raquel Rodriguez's bystander recovery must be reversed as a matter of law. In Texas, bystander recovery is available if a plaintiff can establish that

(1) The plaintiff was located near the scene of the accident, as contrasted with one who was a distance away from it;

(2) The plaintiff suffered shock as a result of a direct emotional impact upon the plaintiff from a sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence; and

(3) The plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

*Freeman v. City of Pasadena*, 744 S.W.2d

923, 923-24 (Tex. 1988).[9]   The Texas Supreme Court, while recognizing that these "elements are flexible and should be applied on a case-by-case basis," recently clarified that the issue of bystander recovery becomes a question of law when the material facts are undisputed. *See U. S. Auto. Ass'n v. Keith*, 970 S.W.2d 540, 542 (Tex. 1998).

In *Keith,* Dianna Keith arrived on the scene of an automobile accident and perceived that her daughter's car was still smoking, and heard the "scary noises" her daughter was making in response to her injuries. Keith remained there while the rescue crews removed her daughter from the car and accompanied her daughter to the hospital.

Despite Keith's being a witness to the pain and suffering that resulted from the accident, the court denied the claim, stating that "Texas law still requires the bystander's presence when the injury occurred and the contemporaneous perception of the accident." *Id.* Where a plaintiff does not meet these requirements, even where the observance of the effects of the injury creates an emotional impact, "[she] is in the same position as any other close relative who sees and experiences the immediate aftermath of a serious injury to a loved one"—recovery is not available. *Id.* That a parent arrives on the scene and witnesses a child's "pain and suffering at the site of the accident rather than at the hospital or some other location does not affect the analysis." *Id.*

Here, Raquel Rodriguez did not witness the injury—she did not have a contemporaneous perception of it. There is little doubt that see-

---

[9] *See also Edinburg Hosp. Auth. v. Trevino*, 941 S.W.2d 76, 80 (Tex. 1997).

10

1985))). "To rise to the level of constitutional error, the district judge's actions, viewed as a whole, must amount to an intervention that could have led the jury to a predisposition of guilt by improperly confusing the functions of judge and prosecutor." *Bermea*, 30 F.3d at 1569; *see also United States v. Mizell*, 88 F.3d 288, 296 (5th Cir. 1996).

"Our review of the trial court's actions must be based on the entire trial record." *Saenz*, 134 F.3d at 702 (citing *United States v. Carpenter*, 776 F.2d 1291, 1294 (5th Cir. 1985)). "A trial judge's comments or questions are placed in the proper context by viewing the 'totality of the circumstances, considering factors such as the context of the remark, the person to whom it is directed, and the presence of curative instructions.'" *Id.* (quoting *United States v. Lance*, 853 F.2d 1182) (5th Cir. 1988). "The totality of the circumstances must show that the trial judge's intervention was 'quantitatively and qualitatively substantial.'" *Id.* (quoting *Bermea*, 30 F.3d at 1569).

Evidently the district court did not appreciate that by effectively consolidating the defendants, it allowed the jury to return a verdict when the plaintiffs had not proven each element of their case; we have already dealt with this error by reversing and remanding. The remainder of the court's actions did not amount to prejudicial conduct that meets the plain error standard applicable here. Although the court often intervened, our thorough review of the record does not reveal systematic bias rising to the plain error standard. Furthermore, the court specifically instructed the jury that it should give no special weight to any questions it asked of the witnesses.[10]

We do note, however, that some of the court's comments could have been interpreted by the jury as an indication of the court's preference for plaintiffs over defendants. We decline to indicate whether, had defendants objected, we would reverse on this additional ground. The court is reminded that, on remand, it must be careful not to use its extensive authority over the proceedings to prejudice the result.

We are troubled, in addition, by the court's questioning of a defense expert who estimated that the speed at which Rodriguez hit the ground was one-half the speed that plaintiffs' expert had estimated. The court took control of the questioning and suggested that the defense witness should agree with him that, if the injury occurred on that play, and if Rodriguez fell more slowly than plaintiffs say he did, it must mean that the helmet was even more defective than previously thought, because it did not protect Rodriguez at the slower speed. The court then opined that

_____

[10] The court instructed:

If I did not tell you when we began this case, I sure mean to tell you now. I didn't have an opinion then. I still don't.

And although I asked questions, I asked you when we started this case to be very mindful of the fact that you were not to give them any less or more importance because I asked them. It is not my intention and never was it my intention to invade what is exclusively your province.

So if I did anything to lead you to believe that I had an opinion about the case, please disregard it. That was not my intention.

12

ing her son suffering from the effects of his accident—frothing at the mouth and spitting saliva—was horrifying and emotionally painful. Emotional distress, however, must occur under certain conditions, not met here, for a parent to be entitled to bystander recovery. The court erred in allowing this question of law to go to the jury.

## V.
### A.

Defendants claim the court committed plain error by repeatedly intervening in the trial to the plaintiffs' benefit and by encouraging the jury to think of the defendants as one entity. The testimony of the expert witnesses was in sharp conflict on the issues of causation and design defect. The credibility of the experts therefore became a crucial criterion by which the jury could determine whom to believe. Defendants contend the court repeatedly questioned defense witnesses in such a way so as to discredit them and show that the court did not believe them.

Further, defendants aver that the court's references to Jose Rodriguez as a "victim" and to defendants as "defendant" tipped the jury that the judge thought Rodriguez was a victim of defendants' product and that the defendants could be viewed as one entity, in contradiction of corporate law. Finally, defendants claim the court took charge of the questioning of one defense witness and suggested an argument against defendants that plaintiffs had not come up with on their own.

Defendants did not object at trial to the court's interventions, so a plain error standard applies. *See United States v. Gray*, 105 F.3d 956, 964 (5th Cir. 1997). Plain error is "'clear' or 'obvious,' and, '[a]t a minimum,' contemplates an error which was 'clear under current law' at the time of trial." *United*

*States v. Calverley*, 37 F.3d 160, 162-63 (5th Cir. 1994) (en banc) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). "[T]o be reviewable under this standard an obvious legal error must affect substantial rights. . . . [P]lain forfeited errors affecting substantial rights should be corrected on appeal only if they 'seriously affect the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* at 164 (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)).

"A trial judge has wide discretion over the 'tone and tempo' of a trial and may elicit further information from a witness if he believes it would benefit the jury." *United States v. Rodriguez*, 835 F.2d 1090, 1094 (5th Cir. 1988) (quoting *United States v. Adkins*, 741 F.2d 744, 747 (5th Cir. 1984)). Federal Rule of Evidence 614(b) allows the court to "interrogate witnesses, whether called by itself or by a party." The court "'may question witnesses and elicit facts not yet adduced or clarify those previously presented.'" *United States v. Williams*, 809 F.3d 1072, 1087 (5th Cir. 1987) (quoting *Moore v. United States*, 598 F.2d 439, 442 (5th Cir. 1979)). "A judge's questions must be for the purpose of aiding the jury in understanding the testimony." *United States v. Saenz*, 134 F.3d 697, 702 (1998) (citing *United States v. Bermea*, 30 F.3d 1539, 1570 (5th Cir. 1994)). "However, the trial court's efforts to move the trial along may not come at the cost of 'strict impartiality.'" *Id.* (citing *United States v. Davis*, 752 F.2d 963, 974 (5th Cir. 1985)).

"In reviewing a claim that the trial court appeared partial, this court must 'determine whether the judge's behavior was so prejudicial that it denied the [defendant] a fair, as opposed to a perfect, trial.'" *Id.* (quoting *Williams*, 809 F.2d at 1086 (quoting *United States v. Pisani*, 773 F.2d 397, 402 (2d Cir.

because of this, he thought defendants instead should be arguing that the speed was higher.[11]

---

[11] The relevant portion of the transcript states:

The Court: But let us assume for the sake of speaking, if you can from an engineering standpoint, we understand you have to confine yourself to that, that there is no preexisting injury and this was as a result of something that was wrong with the helmet, itself, shouldn't the ones who are claiming would want him to come down slower and the ones against whom the claims are made want him to be coming down faster?

* * *

The Court: Wouldn't you then expect defendants to want him to go down faster and plaintiffs to want him to go down slower?

The Witness: I see what you are saying.

The Court: To show that, for example, the item did not serve its purpose even at a slower impact?

* * *

The Court: For example, if—and that is not for us to determine, and I am not presupposing that—there is something wrong with this helmet, that there is more wrong with it if he went down more slowly?

The Witness: If you start out with that premise, I would agree with you.

* * *

The Court: So for us lay persons, why is one side wanting it to be faster and the

(continued...)

Defendants reason that this intervention was an attempt to help the plaintiffs by undercutting defendants' theory of the case. We agree that, at best, the comments violated the stricture that a court should not comment on trial strategy. *Moore v. United States*, 598 F.2d 439, 445 (5th Cir. 1979). The court should keep this in mind on remand.

### B.

Defendants contend the court improperly allowed Stalnaker's expert testimony without fulfilling the gatekeeping role required by *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *Daubert*, in conjunction with Federal Rule of Evidence 702, "imposes a special obligation upon a trial judge to ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589). This obligation pertains not only to scientific evidence but to "all expert testimony." *Id.*

To trigger a *Daubert* inquiry, an expert's testimony, or its "factual basis, data, principles, methods, or their application," must be "called sufficiently into question." *Id.* at 149; *see Tanner v. Westbrook*, 174 F.3d 542, 546 (5th Cir. 1999). Defendants moved to exclude Stalnaker, challenging the basis for his opinion and including an affidavit from one of their experts that disagreed with the testimony.

Because we are remanding, we do not inquire whether the court abused its discretion in admitting Stalnaker's testimony, but we

---

[11](...continued)
other one wanting it to be slower? Do you know?

note that under *Tanner, id.* at 545, the court must articulate its basis for admitting expert testimony and that the proponent of expert testimony "must prove by a preponderance of the evidence that the testimony is reliable." *Id.* at 547.

### C.

Defendants complain that the court granted each side seven peremptory strikes instead of the usual three and that this allowed plaintiffs to "remove all or virtually all of one part of the population (the educated sector, the middle-class, and the upper middle-class)." Defendants do not in any way support their assertion, nor do they explain how the plaintiffs were able to control the makeup of the jury when defendants had an equal number of strikes and therefore could have struck members of other perceived sectors of the population, assuming such persons were in the venire.

The record shows that the court gave extra strikes because there were many more potential jurors available at that time than there were trials. Title 28 U.S.C. § 1870 allows a court complete discretion in apportioning additional peremptory challenges on the basis of multiple parties on either or both sides of a suit. Although caselaw from this and other circuits demonstrates that additional strikes usually are granted when multiple parties on the same side of a suit are antagonistic in some respects and, therefore, may not share the same strategy for striking potential jurors, there is no definite rationale in the rules that specifies the circumstances under which a court may grant more than three strikes.

Defendants cite *Globe Indemnity Co. v. Stringer,* 190 F.2d 1017, 1018 (5th Cir. 1951), which characterizes the discretion given under

28 U.S.C. § 1870 as not "arbitrary or unreasonable," but "reviewable where the record discloses its improper or unreasonable exercise." Abuse of discretion has been found, however, only in instances in which a court *refused* to grant more than three strikes—either because it was unaware of its ability to do so or because it did not correctly perceive the harm done to one or more parties who could not agree on strikes. *See, e.g., John Long Trucking, Inc. v. Greear,* 421 F.2d 125, 128 (10th Cir. 1970). In the absence of either statutory language regarding the proper exercise of judicial discretion in granting additional jury strikes or caselaw stating that granting additional strikes to multiple parties with fully aligned interest is improper, we cannot find an abuse of discretion here.

The judgment is REVERSED, and judgment is RENDERED in favor of defendant RSI. This matter is REMANDED for further proceedings consistent with this opinion.

14