279

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

APR 1 3 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| RAQUEL O. RODRIGUEZ | § | |
| AND JOSE L. RODRIGUEZ | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-CV-96-177 |
| | § | |
| RIDDELL SPORTS, INC. | § | |
| RIDDELL, INC. | § | |
| ALL AMERICAN SPORTS CORPORATION | § | |
| D/B/A RIDDELL/ALL AMERICAN | § | |
| AND CHRIS HOODMAN | § | |

## DEFENDANT, RIDDELL, INC.'S
## MOTION TO RECUSE AND MEMORANDUM IN SUPPORT THEREOF

Now comes Defendant, Riddell, Inc., and moves the Court to recuse Judge Filemon Vela and to appoint another Judge to hear the retrial of this matter and in support thereof files the affidavit of Richard J. Lester, corporate counsel, Patricia Vernon and Barbara Durand Hollis, disinterested observers of the first trial of this case as well as its memorandum of law. This motion is filed to pursuant to Title 28 U.S.C. §144 and §455(a), (b1) in that the evidence presented clearly shows that the Honorable Judge Filemon Vela has a personal bias in favor of the Plaintiffs and/or prejudice against this Defendant or alternatively that his impartiality may reasonably be questioned by an average person.

### A. Introduction

1.    Riddell, Inc. and All American Sports Corporation are Defendants. Raquel O. Rodriguez and Jose Rodriguez are Plaintiffs.

2.    Plaintiff sued defendants for personal injury and loss of consortium based on products liability. Claiming that Jose Rodriguez sustained permanent brain damage because of the design and negligence, including gross negligence, of Riddell, as well as design defects which made the Riddell VSR-4 football helmet worn by Jose defective and unreasonably dangerous.

3.    This case was tried before Judge Vela and a duly impaneled jury on March 8, 1999 through March 16, 1999.

4.    Defendants, Riddell, Inc. files this motion requesting that the recusal of Judge Filemon Vela.

5.    Defendant files this motion at least ten days before this case is set for hearing or trial.

## B.  Argument

6.    The due process clause of the U.S. Constitution entitles a person to an impartial and disinterested tribunal in all cases. *See Marshall v. Jerrico, Inc.,* 446 U.S. 238, 242-44, 100 S.Ct. 1610, 1613-14 (1980).

7.    If a judge has a personal bias or prejudice against a party, in favor of any adverse party, or about the subject matter of the suit, the judge should recuse himself or herself. 28 U.S.C. §§144, 455(b)(1). For recusal to be proper, the bias or prejudice must stem from an extrajudicial source, be personal, and cast doubt on the judge's impartiality. *Liteky v. U.S.,* 510 U.S. 540, 552-56, 114 S.Ct. 1147, 1155-57 (1994); *Maez v. Mountain States Tel. & Tel., Inc.,* 54 F.3d 1488, 1508 (10th Cir. 1995). Opinions formed by the judge on the basis of facts introduced or events occurring in the course of the proceedings may constitute a basis for bias or partiality if they display a deep-seated favoritism or antagonism that would prevent fair judgment. *Liteky v. U.S.,* 510 U.S. 540, at 555, U.S. v. Darden, 70 F3rd 1507, 1536 (8th Cir. 1995). As the affidavits of Richard Lester, Exhibit A; Patricia Vernon, Exhibit B, and Barbara Durand-Hollis, Exhibit C, show the attitude, demeanor, tone of voice and verbal opinions and comments expressed by Judge Vela both on and off the bench clearly indicate that a reasonable person might doubt the judge's impartiality. *Hook v McDade,* 89 F.3d 350, 355 (7th Cir. 1976).

8.    Specifically, throughout the trial of the case, the judge's repeated reference to Jose Rodriguez as the "victim" and Riddell, Inc. as Defendant reflected a bias favoring Plaintiffs and against the Defendant to an average person. *Pashaian v. Eccelston Prop., Ltd.,* 88 F.3rd 77, 84-85 (2nd Cir 1986). The Fifth Circuit in reviewing the Statement of Facts noted "That some of the court's comments could have been interpreted by the jury as an indication of the court's preference for Plaintiffs over Defendants." (Page 12 of the opinion, attached as Exhibit D) While the appellate court concluded that the totality of circumstances did not meet the plain error standard it specifically stated that "That some of the court's comments met the test under 28 USC §455 in that they could have been interpreted by the jury as an indication of the court's preference for Plaintiffs over Defendants." Further, the observations of disinterested, average persons resulted in the same interpretation that Judge Filemon Vela was not impartial, but rather biased towards the Plaintiffs and against the Defendants. (See affidavits of Patricia Vernon and Barbara Durand-Hollis.)

8.    The Court should grant this Defendant's motion to recuse for the following reasons:

        a.    Judge Filemon Vela's bias is personal and was expressed off the bench as an extrajudicial source.

b.   Judge Filemon Vela's conduct during the first trial of this case indicated to reasonable persons an outward manifestation of favoritism towards the Plaintiffs and antagonism toward Riddell, Inc.

c.   Judge Filemon Vela's words and demeanor indicated a deep-seated favoritism towards the Plaintiffs or antagonism against the Defendant which was readily apparent to reasonable persons during the trial. *Liteky v. U.S.* 510 U.S. 540, 555 (1994); *U.S. v. Darden*, 70 F. 3rd 1507, 1536, 8 Cir. 1995.

d.   There is a reasonable factual basis for calling Judge Filemon Vela's impartiality into question as noted by the Fifth Circuit and as supported by the affiants herein.

e.   The public's confidence in the judiciary will be irreparably harmed if the case is allowed to proceed before a judge who appears to be tainted.

f.   A reasonable person knowing all the relevant facts would harbor doubts about Judge Vela's impartiality.  U.S. v. Cooley, 1F3d 985, 993 (10th Cir. 1993).

### C.  Conclusion

Since the goal of the statute requiring a Judge to disqualify himself in a proceeding in which his impartiality might reasonably be questioned is to avoid even the appearance of impropriety, recusal is required when no actual partiality exists. 28 USC § 455.  In view of the Fifth Circuits ruling that some of the court's comments could have indicated the Court's preference for Plaintiffs over the defendants, failure to recuse under these circumstances would amount to an abuse of discretion.  *U.S. Bremers*, 195 F3rd 221, 226 5th Cir. (1999).

Respectfully submitted,

ROBERT B. SUMMERS & ASSOCIATES
P. O. Box 398
Llano, Texas  78643
(915) 248-0033-Phone
(915) 248-0110-Fax

BY _____
ROBERT B. SUMMERS
State Bar No. 19507000
ANN H. MEGEE
State Bar No. 13902700

Attorneys for Defendant
Riddell, Inc.

THORNTON, SUMMERS, BIECHLIN,
DUNHAM & BROWN, L.C.
418 E. Dove
McAllen, Texas 78504
956-630-3080 Telephone
956-630-0189 Facsimile

BY: _____
Robert L. Guerra
State Bar No. 08578560
Attorneys for Defendant Riddell, Inc.

# CERTIFICATE OF CONFERENCE

This is to certify that I had a conference with Plaintiffs' counsel, Rex Blackburn, and he refused to agree to this motion.

Robert L. Guera

*for*

Robert Summers

Case 1:96-cv-00177   Document 279   Filed in TXSD on 04/13/2001   Page 6 of 47

Revised February 16, 2001

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

---

99-40680

---

Raquel O. Rodriguez and Jose L. Rodriguez,

Plaintiffs-Appellees.

versus

Riddell Sports, Inc., et al.,

Defendants.

Riddell Sports, Inc.; Riddell, Inc.;

and

All American Sports Corp.,

Doing Business as Riddell/All American,

Case 1:96-cv-00177  Document 279  Filed in TXSD on 04/13/2001  Page 7 of 47

Defendants-Appellants.

---

Appeals from the United States District Court

for the Southern District of Texas

---

February 14, 2001

Before JOLLY, JONES, and SMITH,

Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Defendants, Riddell Sports, Inc. ("RSI"), Riddell, Inc. ("RI"), and All American Sports Corporation, doing business as Riddell/All American. ("AA"), appeal a judgment holding them strictly liable for a design defect in a football helmet worn by plaintiff Jose Rodriguez when he allegedly suffered a blow causing brain injury, and finding them liable for the bystander emotional distress suffered by Jose's mother, Raquel Rodriguez. Concluding that the district court erred in charging the jury and that, as a matter of law, no bystander claim was viable, we reverse, remand in part, and render in part.

## I.

In 1995, Jose was a football player at Los Fresnos High School. At the first football scrimmage of the

Case 1:96-cv-00177   Document 279   Filed in TXSD on 04/13/2001   Page 8 of 47

year, he played both offense and defense and took more than twenty hits to his helmet. After making his last tackle, which witnesses described as a seemingly normal one, he got up, went to the huddle, and walked or jogged off the field to the bench, where he first sat, then lay down in front of the bench and lost consciousness.

Jose's mother, Raquel, was present in the stands during the scrimmage but did not see Jose's last tackle, see him leave the field, or see him lie down. Sometime later, she was told that he was lying on the ground, so she went down to the field and saw him unconscious and foaming at the mouth. Jose was taken to a hospital and diagnosed as having suffered a subdural hematoma, causing permanent brain injury and a permanent vegetative state.

## II.

Jose and his mother sued for product liability and bystander injury against the manufacturer of Jose's helmet. They asserted that a design defect in the VSR-4 helmet manufactured by RI and reconditioned by AA significantly increased the chance of impact-induced brain injury such as that Jose had suffered.

Defendants are separate but related corporations. RI manufactures the VSR-4 helmet; AA is an athletic equipment reconditioner; RSI is a holding company and the parent of RI and AA. The VSR-4 helmet Jose wore was manufactured by RI and purchased by the school district before the 1994 football season and was reconditioned by AA in early 1995. The helmet's liner contained cells of an energy-absorbing foam ("old" Rubatex 3952 foam) that plaintiffs claim was fabricated by RI in September 1993.

Plaintiffs assert that the helmet was manufactured and purchased in 1994. They base this contention on the fact that the number "94010677" stamped in the shell of the helmet meant the year 1994 and that the number "993" stamped in the liner meant September 1993. Defendants challenge this claim, arguing that the helmet may have been manufactured as early as 1992.

In 1994, RI received samples of a new energy-absorbing foam. It did some initial tests on the foam from February to May 1994 but did not test the foam again until October 1995, when it concluded that the new foam had better energy-absorbing qualities and began to use it in its helmets.

Plaintiffs claim that if Jose's helmet had contained the new foam or thicker pieces of the old foam, the injury would not have occurred. Plaintiffs' biomechanical expert, Dr. Stalnaker, testified that the new foam would have reduced substantially the risk of a subdural hematoma. Therefore, Stalnaker characterized Jose's helmet as defective and unreasonably dangerous and, alternatively, opined that it

Case 1:96-cv-00177   Document 279   Filed in TXSD on 04/13/2001   Page 9 of 47

Teague.opn

could have been made safer simply by using less "comfort" foam and thicker pieces of the old energy-absorbing foam.

In response, RI's helmet designer stated that the helmet Stalnaker designed for demonstration at trial, with thicker energy-absorbing foam, was not practical. Stalnaker's design required removing most of the soft "comfort" foam and replacing it with hard energy-absorbing foam. RI's designer claimed players would not wear such a helmet, because it would be too uncomfortable. As to the claim that the new energy-absorbing foam should have been used in Jose's helmet, RI argued that it could not be used until testing was complete in October 1995—two months after Jose's injury.

Plaintiffs argued, however, that RI could have begun using the new foam much earlier, because RI had received its first samples of it in February 1994. RI disagreed, introducing evidence that it had sent the sample foam back to the supplier for the supplier to address some concerns RI had with it. RI also presented testimony that the producer of the new foam was not sure initially that it could supply the new foam consistently.

Nonetheless, plaintiffs alleged that the reason the new foam was not tested again until October 1995 was that RI wanted to use up its stock of old, inferior foam. The only evidence plaintiffs introduced to support these allegations was that RI canceled an order of the old foam in 1993. This occurred, however, before RI had even received samples of the new foam.

Plaintiffs also argued that even if Jose's helmet was manufactured before RI received any new foam, the new foam could have been inserted by AA when it had Jose's helmet from December 1994 to May 1995 for reconditioning. Defendants denied that the new foam was available for use at that time and argued further that AA, as a mere service provider, had no obligation to upgrade Jose's helmet.

In addition to the products liability claim, plaintiffs assert a bystander claim on the theory that Raquel Rodriguez witnessed the manifestation of Jose's injury and, under Texas law, is entitled to recover for emotional distress. Defendants dispute the existence of any such bystander claim, because Raquel Rodriguez did not perceive both the accident and the manifestation of injury.

After plaintiffs rested, defendants moved for judgment as a matter of law ("j.m.l.") for insufficiency of the evidence on the design defect claim and as to the bystander claim. After both sides closed, the court deemed all motions timely reurged.

Case 1:96-cv-00177   Document 279   Filed in TXSD on 04/13/2001   Page 10 of 47

04/12/01  09:21P  P.006

Defendants also objected to the jury charge, arguing that the questions--which referred to the defendants as one entity—could allow the jury to find for plaintiffs without their having proved their case against each defendant. The court denied the objection.

After the verdict, defendants reurged their motion for j.m.l. on the bystander claim. The court denied all pending motions and awarded Jose $9.9 million and Raquel $1.55 million.

## III.

### A.

Defendants contend the court erred as a matter of law in its jury charge by treating all the defendants as one entity and submitting questions on products liability as to parent RSI. It is undisputed that defendants objected to the charge before the case was submitted, in accordance with Fed. R. Civ. P. 51. We review errors of law *de novo* but reverse a charging error only where "the charge as a whole leaves us with substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." *Stine v. Marathon Oil Co.*, 976 F.2d 254, 259 (5th Cir. 1992) (citation omitted).

Question One of the charge asked: "Was there a design defect in the VSR-4 football helmet at the time it left the possession of *Defendants* that was a producing cause of the injury in question? (Emphasis added.) Question Four, the other question referring to the defendants, asked: "Did the *Defendants'* actions rise to a level of willful or callous and reckless indifference to the safety or rights of others?" (Emphasis added).[1]

The evidence showed that AA is a separate corporation from RI. Although both AA and RI are owned by RSI, a holding company, plaintiffs did not argue that defendants were alter egos, that they were agents of each other, or that the corporate veil should be pierced. Absent proof of one of these conditions, the corporate form must be respected. *See Lucas v. Tex. Indus., Inc.*, 696 S.W.2d 372, 374 (Tex. 1985).

Defendants argue that treating them as one entity was an error of law, because they are separate, and that the harm of this aggregation is that it allowed the jury to apply the strict liability standard--which applies only to manufacturers--to service provider AA and to RSI and allowed the jury to consider the helmet to be in the possession of the manufacturer--thus triggering a duty to upgrade--when it was merely at the shop of a service provider.

Plaintiffs respond that defendants cannot object to the combining of the defendants in the charge,

Case 1:96-cv-00177    Document 279    Filed in TXSD on 04/13/2001    Page 11 of 47

because defendants invited the error by referring to themselves collectively. *See United States v. Baytank Inc.*, 934 F.2d 599, 606 (5th Cir. 1991).[2] Defendants disagree, saying that plaintiffs take defendants' comments out of context and that defense counsel said "defendant" only when referring to a particular defendant, usually RI.

A thorough review of the record shows that defendants did not object as often as they could have when plaintiffs referred to them as one entity and that defense counsel, from time to time, may have been a bit sloppy in his references to defendants.[3] Nonetheless, the evidence is plain that the three defendants were distinct corporations.

Further, it is plaintiffs' duty to prove each element of their *prima facie* case. Thus if combining two corporations into one is necessary to apply a strict liability standard, then plaintiffs must prove that the corporations should be combined, and sloppiness on the part of defendants does not excuse plaintiffs from this burden.

Plaintiffs argue, alternatively, that it was harmless error for the court to combine all three defendants, because defendants have common stockholders and common insurance coverage. Thus, according to plaintiffs, it does not matter which defendant is found liable, because the same insurance company will pay.

This is not enough to disregard the corporate form, however. Under plaintiffs' theory, there would be no point in having separately incorporated subsidiaries, because merely having common stockholders or insurers would be enough to allow the corporate form to be disregarded. Moreover, plaintiffs do not address defendants' argument that aggregating the defendants allowed the jury to treat AA's possession of the helmet as equivalent to RI's possession and control of it--triggering the duties and liabilities that apply to a manufacturer instead of those that apply to a service provider.

### B.

Under Texas law, a manufacturer is strictly liable for a design defect if a product was unreasonably dangerous when it left its control. *Bell Helicopter Co. v. Bradshaw*, 594 S.W.2d 519, 531 (Tex. Civ. App.—Corpus Christi 1979, writ ref'd n.r.e.); Restatement (2d) of Torts § 402A.

If the product is not unreasonably dangerous at the time it leaves the manufacturer's control, the manufacturer does not become strictly liable for damages if the product subsequently becomes unreasonably dangerous unless the manufacturer regains a significant degree of control of the product, and the product is then determined to be unreasonably dangerous before the manufacturer loses control of the product.

Case 1:96-cv-00177   Document 279   Filed in TXSD on 04/13/2001   Page 12 of 47

04/12/01  09:21P  P.008

*Bell Helicopter*, 594 S.W.2d at 531; *Otis Elevator Co. v. Bedre*, 758 S.W.2d 953 at 955 (Tex. App.--Beaumont 1988), *aff'd in part and rev'd in part*, 776 S.W.2d 152 (Tex. 1989).[(4)]

"We evaluate whether a product has a design defect in light of the economic and scientific feasibility of safer alternatives." *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 384 (Tex. 1995) (citing *Boatland, Inc. v. Bailey*, 609 S.W.2d 743, 746 (Tex. 1980)). "The degree of feasibility is one factor courts weigh in balancing the utility of a product versus its risks." *Id.* (citing *Turner v. Gen. Motors Corp.*, 584 S.W.2d 844, 846, 849 (Tex. 1979). "However, if there are no safer alternatives, a product is not unreasonably dangerous as a matter of law." *Id.* (citing *Boatland*, 609 S.W.2d at 748). "Texas law does not require a manufacturer to destroy the utility of his product in order to make it safe." *Hagans v. Oliver Mach. Co.*, 576 F.2d 97, 101 (5th Cir. 1978).

Defendants contend that the jury may have found strict liability in either of two ways, one of which would have been based on legal error. On one hand, the jury may have given credence to plaintiffs' evidence that Jose's helmet was unreasonably dangerous at the time of its design or by the time it was sold. The jury may have believed Stalnaker's testimony that the helmet could have been made safer at the time of its design in 1992 merely by inserting more energy-absorbing foam and using less comfort foam. If the jury reached this conclusion of fact, its verdict would be unassailable, because, by law, if a safer alternative design existed at the time of manufacture and sale, then the product was unreasonably dangerous.

On the other hand, if the jury did not believe that a safer alternative existed when the helmet was sold, it must have found liability under a legally erroneous theory. The jury may have believed defendants' design witness, who testified that Stalnaker's design was infeasible because removing the comfort foam to add more hard, energy-absorbing foam would make the helmet so uncomfortable that no one would want to wear it.

If this were the case, the jury, to reach its finding of liability, must have believed that as soon as RI completed its first round of tests on the new foam in May 1994--seventeen months before RI manufactured any helmets using the new foam--a safer alternative design had become available. The jury further must have believed--because the jury instruction referred to all three defendants as one--that when AA (the reconditioner) had Jose's helmet in May 1995, it was the same as if RI (the manufacturer) had the helmet, and therefore there was a duty to substitute the new foam that RI had in sample form, because the new foam constituted a safer alternative design.[(5)]

This would have been error, because under Texas law a maintenance contract does not impose on the

Case 1:96-cv-00177   Document 279   Filed in TXSD on 04/13/2001   Page 13 of 47

contractor responsibility for design defects or to upgrade a product. *See Muniz v. Ransomes Am. Corp.*, 921 F. Supp. 438, 442 (S.D. Tex. 1995), *aff'd*, 81 F.3d 154 (5th Cir. 1996). In fact, even if, hypothetically, plaintiffs had made a negligence claim against AA for not using the new foam, to maintain the action the contractor must have a duty to enhance the product. AA's contract with the school specifically said that it did not have that duty: "[AA] does not undertake to change or modify the design, construction, material or fitness of the athletic equipment herein listed, it's [*sic*] only obligation being to recondition such equipment as herein specified."

Plaintiffs disagree, arguing that RI regained significant control over the helmet when AA took it in for reconditioning: "As the authorized agent and sister company of Riddell, the VSR-4 helmet is deemed to have left the hands of Riddell on the same day it left the hands of All American with insufficiently thick, inferior 'old' foam." Plaintiffs introduced no evidence that the VSR-4 is the authorized agent or sister company of RI. We assume, though, that plaintiffs meant to argue that RI and AA have such a unique relationship that RI regained a significant degree of control over the helmet when AA reconditioned it, thus subjecting RI to strict liability because the safest available foam was not used.

Plaintiffs rely heavily on *Bell Helicopter*, in which plaintiff claimed that a helicopter had an unreasonably dangerous tail rotor blade. Although the court found that the blade was not unreasonably dangerous when it initially left Bell's control in 1961, the court held that Bell regained "a significant degree of control" of the helicopter when Houston Helicopters, a Bell service station, acquired title to the helicopter in 1969. *Bell Helicopter*, 594 S.W.2d at 530.

In 1970, Bell learned that the tail rotor blade was dangerous and began a program to replace it. The helicopter at issue, however, was never refitted with an improved blade; Houston Helicopters sold the helicopter to the plaintiff in 1973. The court held as a matter of law that Bell had control of the helicopter, for strict liability purposes, when Houston Helicopters owned it, because of "the unique relationship between the service stations and Bell." *Id.* at 531.

Although Bell did not possess the actual power of the FAA to require owners to replace the 102 system with the 117 system, as a practical matter, it could accomplish the same result through its service stations. All of Bell service stations were required to adhere to and comply with all Bell-issued service bulletins or safety notices regarding Bell-made component parts, the servicing of same, or the replacement thereof. Had Bell demanded a replacement of the 102 system with the 117 system or delivered an adequate notice concerning the unreasonably dangerous condition of the 102 system during the time the helicopter remained in the possession of Houston Helicopters, the latter would have complied with Bell's directive.

*Id.*

Defendants contend that *Bell Helicopter* is not determinative and that this case is more like *Dion v. Ford Motor Co.*, 804 S.W.2d 302 (Tex. App.–Eastland 1991, writ denied), which distinguished *Bell Helicopter* and ruled that a manufacturer had not regained a "significant degree of control" of a tractor so as to subject it to strict liability. In *Dion*, a plaintiff sued for damages incurred when his Model 8N tractor rolled over and crushed him; he argued that the tractor was unreasonably dangerous because it did not have a rollover protection system. The court held that the tractor was not unreasonably dangerous when it was manufactured in 1950, because no tractors manufactured at that time had rollover protection systems.

As technology improved, all Ford tractors were built with rollover protection systems, and Ford began manufacturing such systems that could be placed on the Model 8N. The court noted that, like the plaintiff in *Bell Helicopter*, Dion had his tractor serviced at a service station authorized by the manufacturer; no one at the station told him that he should have a rollover protection system installed. The court distinguished *Bell Helicopter*, pointing out that "McMaster Ford never took title to the tractor, and Ford never issued any replacement program for the 8N tractor." *Id.* at 311. The court concluded that "Ford did not regain a 'significant degree of control' as required by *Bell Helicopter Company*." *Id.* [6]

"Whether a duty exists under a given set of facts and circumstances is essentially a question of law for the trial court." *Id.* (citations omitted). We review questions of law *de novo. Stine v. Marathon Oil Co.*, 976 F.2d 254, 259 (5th Cir. 1992).

Our task, therefore, is to determine whether the instant facts are more similar to those in *Bell Helicopter* or to those in *Dion*. If the former, then as a matter of law the manufacturer regained a "significant degree of control" and is strictly liable. If the latter, then strict liability does not apply to the reconditioning of the helmet.

The facts of this case are more similar to those in *Dion*; indeed, they are almost identical. As in *Dion*, RI manufactured and sold the product, at which point it lost control of it. Then, some time later, an authorized service provider serviced the helmet without ever taking title to it. Further, RI instituted no program to replace the old foam with the new. In fact, RI had not even begun to use the new foam itself.

Thus, as a matter of law, RI never regained the "significant degree of control" required to make it strictly liable for the helmet when it was in AA's shop for servicing. [7] If the jury found RI strictly

liable for AA's failure to improve the helmet, this was legal error.

As we have said, we vacate a jury award if the jury charge as a whole leaves substantial and ineradicable doubt whether the jury has been properly guided. *See Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 614 (5th Cir. 1999). We do not reverse where the jury instructions contain mere factual errors; instead, we assume the jury considered all the evidence in reaching its decision. *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 126 (5th Cir. 1992).

When the court erroneously instructs a jury on the law, however, the jury may correctly apply the facts to the incorrect legal standard in making its decision. Therefore, if a jury could find liability according to multiple theories, and one of them is erroneous, we reverse unless we can tell that the jury came to its decision using only correct legal theories. *Id.* If it is impossible to tell whether a correct theory has been used, we reverse for a new trial. *Id.*[8] Such is the case here.

## C.

The court also erred as a matter of law in allowing the case to go to the jury with regard to RSI. It is undisputed that RSI is a holding company and parent of RI and AA but does not produce anything or place anything in the stream of commerce. "Generally, a court will not disregard the corporate fiction and hold a corporation liable for the obligations of its subsidiary except where it appears the corporate entity of the subsidiary is being used as a sham to perpetrate a fraud, to avoid liability, to avoid the effect of a statute, or in other exceptional circumstances." *Lucas v. Tex. Indus., Inc.*, 696 S.W.2d 372, 374 (Tex. 1985) (citing *Torregrossa v. Szelc*, 603 S.W.2d 803 (Tex. 1980)).

"There must be something more than mere unity of financial interest, ownership and control for a court to treat the subsidiary as the alter ego of the parent and make the parent liable for the subsidiary's tort." *Id.* Nothing of this sort is even alleged, so it was an error of law not to dismiss RSI; we reverse and render judgment for that defendant.

## IV.

Raquel Rodriguez's bystander recovery must be reversed as a matter of law. In Texas, bystander recovery is available if a plaintiff can establish that

(1) The plaintiff was located near the scene of the accident, as contrasted with one who was a distance away from it;

(2) The plaintiff suffered shock as a result of a direct emotional impact upon the plaintiff from a sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence; and

(3) The plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

*Freeman v. City of Pasadena,* 744 S.W.2d 923, 923-24 (Tex. 1988).[2] The Texas Supreme Court, while recognizing that these "elements are flexible and should be applied on a case-by-case basis," recently clarified that the issue of bystander recovery becomes a question of law when the material facts are undisputed. *See U. S. Auto. Ass'n v. Keith,* 970 S.W.2d 540, 542 (Tex. 1998).

In *Keith,* Dianna Keith arrived on the scene of an automobile accident and perceived that her daughter's car was still smoking, and heard the "scary noises" her daughter was making in response to her injuries. Keith remained there while the rescue crews removed her daughter from the car and accompanied her daughter to the hospital.

Despite Keith's being a witness to the pain and suffering that resulted from the accident, the court denied the claim, stating that "Texas law still requires the bystander's presence when the injury occurred and the contemporaneous perception of the accident." *Id.* Where a plaintiff does not meet these requirements, even where the observance of the effects of the injury creates an emotional impact, "[she] is in the same position as any other close relative who sees and experiences the immediate aftermath of a serious injury to a loved one"--recovery is not available. *Id.* That a parent arrives on the scene and witnesses a child's "pain and suffering at the site of the accident rather than at the hospital or some other location does not affect the analysis." *Id.*

Here, Raquel Rodriguez did not witness the injury--she did not have a contemporaneous perception of it. There is little doubt that seeing her son suffering from the effects of his accident--frothing at the mouth and spitting saliva--was horrifying and emotionally painful. Emotional distress, however, must occur under certain conditions, not met here, for a parent to be entitled to bystander recovery. The court erred in allowing this question of law to go to the jury.

## V.

## A.

04/12/01 09:21P  P.013

Defendants claim the court committed plain error by repeatedly intervening in the trial to the plaintiffs' benefit and by encouraging the jury to think of the defendants as one entity. The testimony of the expert witnesses was in sharp conflict on the issues of causation and design defect. The credibility of the experts therefore became a crucial criterion by which the jury could determine whom to believe. Defendants contend the court repeatedly questioned defense witnesses in such a way so as to discredit them and show that the court did not believe them.

Further, defendants aver that the court's references to Jose Rodriguez as a "victim" and to defendants as "defendant" tipped the jury that the judge thought Rodriguez was a victim of defendants' product and that the defendants could be viewed as one entity, in contradiction of corporate law. Finally, defendants claim the court took charge of the questioning of one defense witness and suggested an argument against defendants that plaintiffs had not come up with on their own.

Defendants did not object at trial to the court's interventions, so a plain error standard applies. *See United States v. Gray*, 105 F.3d 956, 964 (5th Cir. 1997). Plain error is "'clear' or 'obvious,' and, '[a]t a minimum,' contemplates an error which was 'clear under current law' at the time of trial." *United States v. Calverley*, 37 F.3d 160, 162-63 (5th Cir. 1994) (en banc) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). "[T]o be reviewable under this standard an obvious legal error must affect substantial rights. . . . [P]lain forfeited errors affecting substantial rights should be corrected on appeal only if they 'seriously affect the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* at 164 (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)).

"A trial judge has wide discretion over the 'tone and tempo' of a trial and may elicit further information from a witness if he believes it would benefit the jury." *United States v. Rodriguez*, 835 F.2d 1090, 1094 (5th Cir. 1988) (quoting *United States v. Adkins*, 741 F.2d 744, 747 (5th Cir. 1984)). Federal Rule of Evidence 614(b) allows the court to "interrogate witnesses, whether called by itself or by a party." The court "'may question witnesses and elicit facts not yet adduced or clarify those previously presented.'" *United States v. Williams*, 809 F.3d 1072, 1087 (5th Cir. 1987) (quoting *Moore v. United States*, 598 F.2d 439, 442 (5th Cir. 1979)). "A judge's questions must be for the purpose of aiding the jury in understanding the testimony." *United States v. Saenz*, 134 F.3d 697, 702 (1998) (citing *United States v. Bermea*, 30 F.3d 1539, 1570 (5th Cir. 1994)). "However, the trial court's efforts to move the trial along may not come at the cost of 'strict impartiality.'" *Id.* (citing *United States v. Davis*, 752 F.2d 963, 974 (5th Cir. 1985)).

"In reviewing a claim that the trial court appeared partial, this court must 'determine whether the judge's behavior was so prejudicial that it denied the [defendant] a fair, as opposed to a perfect, trial.'" *Id.* (quoting *Williams*, 809 F.2d at 1086 (quoting *United States v. Pisani*, 773 F.2d 397, 402 (2d Cir. 1985))). "To rise to the level of constitutional error, the district judge's actions, viewed as a whole, must amount to an intervention that could have led the jury to a predisposition of guilt by improperly confusing the functions of judge and prosecutor." *Bermea*, 30 F.3d at 1569; *see also United States v.*

Case 1:96-cv-00177   Document 279   Filed in TXSD on 04/13/2001   Page 18 of 47

*Mizell*, 88 F.3d 288, 296 (5th Cir. 1996).

"Our review of the trial court's actions must be based on the entire trial record." *Saenz*, 134 F.3d at 702 (citing *United States v. Carpenter*, 776 F.2d 1291, 1294 (5th Cir. 1985)). "A trial judge's comments or questions are placed in the proper context by viewing the 'totality of the circumstances, considering factors such as the context of the remark, the person to whom it is directed, and the presence of curative instructions.'" *Id.* (quoting *United States v. Lance*, 853 F.2d 1182) (5th Cir. 1988). "The totality of the circumstances must show that the trial judge's intervention was 'quantitatively and qualitatively substantial.'" *Id.* (quoting *Bermea*, 30 F.3d at 1569).

Evidently the district court did not appreciate that by effectively consolidating the defendants, it allowed the jury to return a verdict when the plaintiffs had not proven each element of their case; we have already dealt with this error by reversing and remanding. The remainder of the court's actions did not amount to prejudicial conduct that meets the plain error standard applicable here. Although the court often intervened, our thorough review of the record does not reveal systematic bias rising to the plain error standard. Furthermore, the court specifically instructed the jury that it should give no special weight to any questions it asked of the witnesses.[(10)]

We do note, however, that some of the court's comments could have been interpreted by the jury as an indication of the court's preference for plaintiffs over defendants. We decline to indicate whether, had defendants objected, we would reverse on this additional ground. The court is reminded that, on remand, it must be careful not to use its extensive authority over the proceedings to prejudice the result.

We are troubled, in addition, by the court's questioning of a defense expert who estimated that the speed at which Rodriguez hit the ground was one-half the speed that plaintiffs' expert had estimated. The court took control of the questioning and suggested that the defense witness should agree with him that, if the injury occurred on that play, and if Rodriguez fell more slowly than plaintiffs say he did, it must mean that the helmet was even more defective than previously thought, because it did not protect Rodriguez at the slower speed. The court then opined that because of this, he thought defendants instead should be arguing that the speed was higher.[(11)]

Defendants reason that this intervention was an attempt to help the plaintiffs by undercutting defendants' theory of the case. We agree that, at best, the comments violated the stricture that a court should not comment on trial strategy. *Moore v. United States*, 598 F.2d 439, 445 (5th Cir. 1979). The court should keep this in mind on remand.

**B.**

Defendants contend the court improperly allowed Stalnaker's expert testimony without fulfilling the gatekeeping role required by *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Case 1:96-cv-00177  Document 279  Filed in TXSD on 04/13/2001  Page 19 of 47

*Daubert*, in conjunction with Federal Rule of Evidence 702, "imposes a special obligation upon a trial judge to ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589). This obligation pertains not only to scientific evidence but to "all expert testimony." *Id.*

To trigger a *Daubert* inquiry, an expert's testimony, or its "factual basis, data, principles, methods, or their application," must be "called sufficiently into question." *Id.* at 149; *see Tanner v. Westbrook*, 174 F.3d 542, 546 (5th Cir. 1999). Defendants moved to exclude Stalnaker, challenging the basis for his opinion and including an affidavit from one of their experts that disagreed with the testimony.

Because we are remanding, we do not inquire whether the court abused its discretion in admitting Stalnaker's testimony, but we note that under *Tanner, id.* at 545, the court must articulate its basis for admitting expert testimony and that the proponent of expert testimony "must prove by a preponderance of the evidence that the testimony is reliable." *Id.* at 547.

## C.

Defendants complain that the court granted each side seven peremptory strikes instead of the usual three and that this allowed plaintiffs to "remove all or virtually all of one part of the population (the educated sector, the middle-class, and the upper middle-class)." Defendants do not in any way support their assertion, nor do they explain how the plaintiffs were able to control the makeup of the jury when defendants had an equal number of strikes and therefore could have struck members of other perceived sectors of the population, assuming such persons were in the venire.

The record shows that the court gave extra strikes because there were many more potential jurors available at that time than there were trials. Title 28 U.S.C. § 1870 allows a court complete discretion in apportioning additional peremptory challenges on the basis of multiple parties on either or both sides of a suit. Although caselaw from this and other circuits demonstrates that additional strikes usually are granted when multiple parties on the same side of a suit are antagonistic in some respects and, therefore, may not share the same strategy for striking potential jurors, there is no definite rationale in the rules that specifies the circumstances under which a court may grant more than three strikes.

Defendants cite *Globe Indemnity Co. v. Stringer*, 190 F.2d 1017, 1018 (5th Cir. 1951), which characterizes the discretion given under 28 U.S.C. § 1870 as not "arbitrary or unreasonable," but "reviewable where the record discloses its improper or unreasonable exercise." Abuse of discretion has been found, however, only in instances in which a court *refused* to grant more than three strikes— either because it was unaware of its ability to do so or because it did not correctly perceive the harm done to one or more parties who could not agree on strikes. *See, e.g., John Long Trucking, Inc. v.*

Case 1:96-cv-00177 Document 279 Filed in TXSD on 04/13/2001 Page 20 of 47

*Greear*, 421 F.2d 125, 128 (10th Cir. 1970). In the absence of either statutory language regarding the proper exercise of judicial discretion in granting additional jury strikes or caselaw stating that granting additional strikes to multiple parties with fully aligned interest is improper, we cannot find an abuse of discretion here.

The judgment is REVERSED, and judgment is RENDERED in favor of defendant RSI. This matter is REMANDED for further proceedings consistent with this opinion.

1. In explaining Question One, the court said:

Question Number 1 just outright ask [sic] you: Look, was the helmet when it left the possession of the defendant a producing cause of the injury in question? Was there something wrong with it when it left the defendant that produced—was the producing cause of the injury in question?

Later, in instructing the jury on damages, the court said:

It is your first task to decide whether the defendant is liable. I am instructing you on damages—on damages only so that you will have guidance in the event you decide that the defendant is liable and that the plaintiff is entitled to recover money from the defendant.

2. Plaintiffs make a material misrepresentation to bolster their claim that no harm occurred from combining the defendants. Plaintiffs state that "[d]efendants' counsel represented at trial that his three clients, including Riddell Sports, jointly manufactured the helmet." The portion of the record that plaintiffs cite in support of this contains nothing of the sort, nor could we find any such representation elsewhere in the record.

3. Part of the confusion likely was caused by the fact that AA did business as Riddell/All American.

4. *See also Dion v. Ford Motor Co.*, 804 S.W.2d 302, 311 (Tex. App.—Eastland 1991, writ denied).

5. Plaintiffs exhaustively urged this theory to the jury; they combined all of the defendants to argue on closing:

What happens in between their receipt of the new foam in February of '94 and the time that they finally drop tested it? They had Joe Rodriguez' helmet in their hands. They sent a representative out to Los Fresnos High School and they said, "Let us take care of your helmets. We will take them back from you." . . .

And what did they do? They took it back, they charged Los Fresnos High School money and they

returned it to them on May 11, 1995, with the representation on a stamp right here, . . . that says that this is a recertified helmet in accordance with the NOCSAE standards. The representation that they made to the coaches at Los Fresnos High School and indirectly to the players like Joe Rodriguez and to their brothers and sisters like Carmen and Diana and Juan.

The representation was, this is the best helmet that technology can make. That's what they are telling the world, ladies and gentlemen, when they put this thing back on the marketplace on May 11th, 1995.

And what was it really? It wasn't even the best foam that they had sitting on their shelves.

6. The *Dion* court also relied on *Otis Elevator Co. v. Bedre*, 758 S.W.2d 953, 955 (Tex. App.– Beaumont 1988), *rev'd on other grounds*, 776 S.W.2d 152 (Tex. 1989) (per curiam), another case distinguishing *Bell Helicopter*, in which the court made the following factual distinction:

> In this case, the Otis elevator in question had not been sent back to an Otis maintenance and repair shop; nor had the elevator been placed in one of Otis' own authorized service stations. Otis had not regained possession or title to the elevator in question; nor had Otis issued any direct, unequivocal orders or authorizations to replace certain parts or systems on the elevator. In *Bell Helicopter* . . ., these compelling, paramount facts existed.

> Furthermore, no jury finding exists that the elevator in question was defective when it left the possession of Otis and entered into the stream of commerce. In fact, Otis lost control and possession of the elevator when it was sold in 1961. Otis never regained control or possession in the same manner as did Bell Helicopter Company.

7. *Cf. Torres v. Caterpillar, Inc.*, 928 S.W.2d 233, 240-42 (Tex. App.–San Antonio 1996, writ denied) (assuming plaintiff bought a used forklift from an authorized dealer, but refusing to hold that the fact that the dealer acquired and resold the forklift without a rollover bar was enough to allow conclusion that the manufacturer had thus regained a "significant degree of control" to be held strictly liable).

8. We explained in *Walther*, 952 F.2d at 126, that

> [t]he Supreme court has said in the criminal context that "a general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground." *Zant v. Stephens*, 462 U.S. 862, 881 (1983); *see also Neubauer v. City of McAllen*, 766 F.2d 1567, 1575 (5th Cir. 1985). This principle has its origins in *Stromberg v. California*, 283 U.S. 359 (1931), where the Court reversed a conviction when one of three possible bases for the jury's verdict was unconstitutional. . . . In *Griffin v. United States*, 502 U.S. 46 (1991), [however,] the Court explained that the *Stromberg* rule should be applied only when jurors have been left the option of relying on a legally inadequate theory, not a factually inadequate theory.

Case 1:96-cv-00177   Document 279   Filed in TXSD on 04/13/2001   Page 22 of 47

04/12/01  03:21P  P.018

(Parallel citations omitted.)

9. *See also Edinburg Hosp. Auth. v. Trevino,* 941 S.W.2d 76, 80 (Tex. 1997).

10. The court instructed:

If I did not tell you when we began this case, I sure mean to tell you now. I didn't have an opinion then. I still don't.

And although I asked questions, I asked you when we started this case to be very mindful of the fact that you were not to give them any less or more importance because I asked them. It is not my intention and never was it my intention to invade what is exclusively your province.

So if I did anything to lead you to believe that I had an opinion about the case, please disregard it. That was not my intention.

11. The relevant portion of the transcript states:

The Court: But let us assume for the sake of speaking, if you can from an engineering standpoint, we understand you have to confine yourself to that, that there is no preexisting injury and this was as a result of something that was wrong with the helmet, itself, shouldn't the ones who are claiming would want him to come down slower and the ones against whom the claims are made want him to be coming down faster?

* * *

The Court: Wouldn't you then expect defendants to want him to go down faster and plaintiffs to want him to go down slower?

The Witness: I see what you are saying.

Case 1:96-cv-00177   Document 279   Filed in TXSD on 04/13/2001   Page 23 of 47

The Court: To show that, for example, the item did not serve its purpose even at a slower impact?

\* \* \*

The Court: For example, if--and that is not for us to determine, and I am not presupposing that--there is something wrong with this helmet, that there is more wrong with it if he went down more slowly?

The Witness: If you start out with that premise, I would agree with you.

\* \* \*

The Court: So for us lay persons, why is one side wanting it to be faster and the other one wanting it to be slower? Do you know?

Case 1:96-cv-00177    Document 279    Filed in TXSD on 04/13/2001    Page 24 of 47

1   Q    What is that opinion?

2   A    It is my opinion that he did not receive his injury in

3   this play.

4   Q    Can you explain to the jury the basis of that opinion and

5   the reasons for it?

6   A    The first reason is that the velocities are not severe

7   enough to cause an injury in this play.   The velocity, as I

8   measured -- and if you look at this play, this is not a

9   severe play.  This is the kind of play that happens frequently

10  in football games and people are not injured.

11       THE COURT:  Are we to understand that you are saying

12  that he was not injured in the play that we just saw on that

13  film?

14       THE WITNESS:  That is correct, Your Honor.

15       THE COURT:  That's your testimony?

16       THE WITNESS:  That is my opinion, yes.

17       THE COURT:  That he received no injuries as a result

18  of what happened in that play?  Is that what you are saying?

19       THE WITNESS:  Yes.  His injury may have been

20  enhanced a little bit, but he didn't receive the substantial

21  part of his injury in this play.

22       THE COURT:  In other words, if there were substantial

23  injuries they had happened before this play?

24       THE WITNESS:  That is right.   That is right.   The

25  other reason --

1  Q   What is that opinion?

2  A   It is my opinion that he did not receive his injury in

3  this play.

4  Q   Can you explain to the jury the basis of that opinion and

5  the reasons for it?

6  A   The first reason is that the velocities are not severe

7  enough to cause an injury in this play.   The velocity, as I

8  measured -- and if you look at this play, this is not a

9  severe play.  This is the kind of play that happens frequently

10  in football games and people are not injured.

11       THE COURT:  Are we to understand that you are saying

12  that he was not injured in the play that we just saw on that

13  film?

14       THE WITNESS:  That is correct, Your Honor.

15       THE COURT:  That's your testimony?

16       THE WITNESS:  That is my opinion, yes.

17       THE COURT:  That he received no injuries as a result

18  of what happened in that play?  Is that what you are saying?

19       THE WITNESS:  Yes.  His injury may have been

20  enhanced a little bit, but he didn't receive the substantial

21  part of his injury in this play.

22       THE COURT:  In other words, if there were substantial

23  injuries they had happened before this play?

24       THE WITNESS:  That is right.  That is right.  The

25  other reason --

1       THE COURT:  And that's your opinion?

2               THE WITNESS:  Yes, it is.  The other reason is that

3   this is an injury that is induced by sudden rotation, not a

4   direct blow.  And in this play we don't see any sudden

5   rotations.  So not only is the direct velocity too low --

6               THE COURT:  If it was a rotational thing that you

7   were explaining, it didn't happen in that play, either?

8               THE WITNESS:  That is right.  That's my opinion,

9   Your Honor.

10              THE COURT:  Because the rotational play you have

11  already explained to us, you know, it takes a certain kind of

12  energy that plays a role a certain way at a certain time, is

13  that right?

14              THE WITNESS:  That's right.

15  BY MR. SUMMERS:

16  Q   Do you have an opinion based upon a reasonable degree of

17  engineering probability as to -- and I am talking now about

18  the injury that we do know from the medical records that Jose

19  Rodriguez had --  as to whether or not how that was brought

20  about mechanically?

21  A   Well, it could occur two ways.  One way is a

22  nonmechanical way in the sense that we can all have a weakened

23  vein and then our blood pressure pulsates on that vein.

24              MR. BLACKBURN:  Your Honor, I am going to object.

25  This is getting into medical testimony for which there is no

1   evidence.

2          THE COURT:  It may be.  I will allow him to testify.

3   A    And we then have a bleed in an artery or a vein.    It

4   happens in varicose veins, for example.  They can

5   spontaneously rupture and bleed.  It happens in certain types

6   of strokes where people will have a bleed in their brain, or

7   just the reasons that the blood pressure continually pulsating

8   the veins and arteries causes them to fail.

9          So that's one way it could happen.  The other way it

10  could happen would be some sort of rotational induced trauma

11  to Mr. Rodriguez in some other situation.    Not in this play,

12  and I would will say not in the scrimmage.    I have looked

13  through the scrimmage.    This play is the most violent one

14  that we see.    It is also the last one where he walked off the

15  field.

16         THE COURT:  It could have happened before the

17  scrimmage?

18         THE WITNESS:  Yes.  Yes, Your Honor.    I think that

19  is the most likely explanation also.

20         THE COURT:  Before he went to play that day?

21         THE WITNESS:  That is right, Your Honor.    He

22  complained of headaches.    The subdural hematoma was well

23  formed and clotted when they removed it and I think there

24  will be additional testimony in that regard.

25         THE COURT:  So whatever condition existed was simply

Case 1:96-cv-00177   Document 279   Filed in TXSD on 04/13/2001   Page 28 of 47

1    compounded in your opinion as a result of that last play or

2    any plays during the scrimmage?

3            THE WITNESS:  That is correct, Your Honor.

4    BY MR. SUMMERS:

5    Q    So it could have been just spontaneously but you don't

6    think it was a rotational induced one because there wasn't

7    enough rotation?  Is that --

8            MR. BLACKBURN:  Objection.  Mischaracterizes his

9    testimony.

10           THE COURT:  Stand up to the Court any time you are

11   going to object.

12           MR. BLACKBURN:  I am sorry, Your Honor.

13           THE COURT:  Objection is overruled.

14           Don't make statements.  Go ahead and ask questions.

15   Ask your question.

16   BY MR. SUMMERS:

17   Q    Okay.   Am I rephrasing your testimony wrong or right?

18   A    I think a little bit wrong, actually.

19   Q    Tell me how I am wrong.

20   A    What I said, I hope I said, made it clear, is that it

21   could occur in one or two ways, either from a sudden rotation

22   or spontaneously.   But because of the nature of this play,

23   the violence in this play is not sufficient to cause this type

24   of injury, it didn't happen in this play.

25           Now, I don't know whether it happened spontaneously,

1   prior to this play, and that could be days prior to the play,

2   or whether in another football scrimmage or in some other

3   activity he fell or whatever and suffered the kind of rotation

4   that is necessary to cause this injury.   So there are two

5   ways it could happen.

6   Q   Okay.   I want to ask you some more questions about

7   helmets.   You talked to us earlier about --

8   MR. SUMMERS:   May I approach?

9   THE COURT:   Surely.

10   BY MR. SUMMERS:

11   Q   -- this guy Snyder that was a neurosurgeon. .

12   A   That is right, Dr. Richard Snyder, and also the team

13   physician for the University of Michigan football team.

14   Q   And you all jointly worked on a design of a helmet?

15   A   Yes.   I want to make it clear that it was really his idea

16   and his impetus and he generated the funds to do it, and he

17   came to me and asked me to help him from a biomechanical point

18   of view and also to test some of his concepts.

19   Q   Okay.   And did that --  has that evolved into what we know

20   today as the Schutt Air Helmet?

21   A   Yes, it has.

22   Q   That is shown in exhibit -- Plaintiffs' Exhibit 180?

23   A   Yes, it has.

24   Q   Now, I would like to direct your attention to Page 13.

25   Okay.

1    LAWRENCE EUGENE THIBAULT, DEFENDANTS' WITNESS, SWORN

2

3

4                          DIRECT EXAMINATION

5

6    BY MR. GUERRA

7    Q   Sir, will you tell us your name.

8    A   Lawrence Eugene Thibault T-H-I-B-A-U-L-T.

9    Q   And what is your occupation or profession?

10   A   I am a professor of bioengineering and director of the

11   Institute For Injury Research.  That institute is at Drexel

12   University in Philadelphia.  And in association with the

13   Medical College of Pennsylvania, Conomy University School of

14   Medicine and the Thomas Jefferson University School of

15   Medicine.

16   Q   Doctor, what is bioengineering?

17   A   It is one of the two newest disciplines in engineering.

18   The older ones being civil engineering and mechanical,

19   chemical engineering, electrical engineering.

20          But starting around the '50s, around 1950s, people

21   became interested in applying more and more engineering,

22   mathematics, physics technology to the human body.   It became

23   one of the most interesting problems as a matter of fact.

24          About the same time people started playing with

25   machines we now call computers.   But in the '50s there were

1254

1   A   You figure it.   385 pounds, yes, I would think hard is a

2   good description.

3   Q   Are these guys strong?

4   A   Of course.

5   Q   Okay.   Doctor, if you will take your seat.   Would you

6   please tell us, besides the depositions that you have already

7   told us about, did you review the entire scrimmage, the Los

8   Fresnos versus Santa Rosa scrimmage, that Joe Rodriguez was

9   in?

10   A   Yes.

11   Q   Why did you do that?

12   A   Well, basically, to interrogate the film to see whether or

13   not it was possible that some event that was not the event

14   that was being pointed to could in some way, shape or form

15   have exceeded what I would consider enough force to even cause

16   a cerebral concussion because we didn't see any cerebral

17   concussion, at least in the film that I saw.

18   Q   Including --

19   A   There were no events that could --

20   Q   Including the last play that the plaintiffs are calling

21   the event play, you have looked at that one, too?

22   A   Sure.

23   Q   Okay.

24        THE COURT:   It is your testimony --  after reviewing

25   that film, it is your opinion that he didn't get hurt on that

CutePDF - www.tesio.com

Case 1:96-cv-00177   Document 279   Filed in TXSD on 04/13/2001   Page 32 of 47

1  last play?

2          THE WITNESS:  I was asked if he was concussed, and

3  the answer is, no, he was not concussed.

4          THE COURT:  No.  But did you listen to my question?

5          THE WITNESS:  No, I can't as to the rest of his

6  body.  His brain was not hurt on that play.

7          THE COURT:  It is your testimony that -- or it is

8  your opinion --

9          THE WITNESS:  Yes, sir.

10         THE COURT: -- that after having viewed that film,

11 considering all the information you have given us as far as

12 your studies and your research and the like, your experiences,

13 that you do have an opinion as to whether that last play

14 resulted in the injuries caused to his brain?

15         THE WITNESS:  Correct.

16         THE COURT:  And your opinion is that it did not.

17         THE WITNESS:  It did not.

18         THE COURT:  Did it have anything to do with it?

19         THE WITNESS:  No.

20         MR. GUERRA: Okay.

21         THE COURT:  Doctor, did you see the plays before

22 that?

23         THE WITNESS:  Oh, I tried to watch them as best I

24 could, you know.  It is not a great --  in the NFL I get

25 fifteen camera angles every time.

Case 1:96-cv-00177   Document 279   Filed in TXSD on 04/13/2001   Page 33 of 47

04/12/0:   3:21P   P.028
APR.12.2001   1:22PM   THORNTON & SUMMERS                           NO.229   .P.4.

1256

1   THE COURT: I am not asking you about the NFL.

2        THE WITNESS: I looked at all the other plays.

3   THE COURT: I am asking you about the plays right

4   before that, the plays before that.

5        THE WITNESS: Yes.

6   THE COURT: Did you see those?

7        THE WITNESS: Uh-huh.

8   THE COURT: Would you agree that at least on the face

9   of what one sees when you view those films he was quite

10  active?

11       THE WITNESS: Oh, absolutely. No, I think he was.

12  He was running.  He looked normal.

13  THE COURT: And so whatever was wrong with him was

14  already wrong with him, would that be your testimony?

15       THE WITNESS: Yeah.   Yeah.   It didn't manifest

16  itself into the latter stages where he began to lose and

17  disassociate, lose consciousness and disassociate.   Something

18  was going on for a while and, of course, we know that from the

19  surgical reports.

20  THE COURT: Let me go back to the original question

21  that I inquired of and that was pertaining to the last

22  incident.

23       THE WITNESS: Yes.

24  THE COURT: You said -- stated that it was your

25  opinion that it had nothing to do with what happened to him?

Case 1:96-cv-00177   Document 279   Filed in TXSD on 04/13/2001   Page 34 of 47

1    THE WITNESS:  That is correct.

2    THE COURT:  That is your opinion?

3    THE WITNESS:  Yes, sir.

4    THE COURT:  In no fashion?

5    THE WITNESS:  No.   I mean that loading condition, if

6    you will, is experienced every game by every player.  And

7    in the entire NFL this year I saw 15 concussions.   They are

8    playing 20 games, about 90 plays a game, thousands and

9    thousands, tens of thousands of hits and tackles, helmet to

10   helmet, getting kicked in the head.  The wide receiver, who

11   is already six foot seven, goes up and as he is reaching for

12   the ball his legs are taken out and he is falling from about

13   eight or nine feet onto his head.  Some of them see stars and

14   get dazed.  Some of them even lose unconsciousness.   I have

15   seen two that were out for about two minutes.

16         That is way below any threshold for bleeding in the

17   brain or subdural hematoma, in particular.  That requires a

18   tremendous amount of energy.

19         There is not enough energy in the game of football to

20   produce that event.

21         THE COURT:  Okay.

22         THE WITNESS:  We see it in automotive accidents.

23         THE COURT:  Let us assume -- making reference to

24   your expertise and your background, let us assume that the

25   injury resulted from what took place on that last play, can we

Case 1:96-cv-00177    Document 279    Filed in TXSD on 04/13/2001    Page 35 of 47

1  do that?

2             THE WITNESS:  Resulted from the --

3             THE COURT:  From what took place on that last play.

4             THE WITNESS:  Okay.

5             THE COURT:  Let us assume that.  Do you have an

6  opinion as to what would have caused it?

7             THE WITNESS:  I can't --

8             THE COURT:  If you don't, that's fine.   I appreciate

9  the fact that you may not have viewed --

10            THE WITNESS:  I am trying to answer like a scientist,

11 and that's what I am and that's what I do.   The only thing I

12 could honestly say was --  it is possible -- the bridging

13 vein that we are talking about, Your Honor, up here, where

14 they enter into this V shape trough as depicted in this

15 diagram, there could be some abnormality of the connected

16 tissue in the dura, which is an elastin collagen matrix.

17 There are various genetic defects of that type that wouldn't

18 tear the vein but would allow it to pull out.

19            THE COURT:  Would your opinion --

20            THE WITNESS:  I am trying to hypothesize now.

21            THE COURT:  Would your opinion, considering that as

22 an assumption, that the last play caused the injuries in

23 question --

24            THE WITNESS:  I am taking your hypothetical.

25            THE COURT:  -- Yes, I understand that --  preclude,

Case 1:96-cv-00177   Document 279   Filed in TXSD on 04/13/2001   Page 36 of 47

1   then, that the helmet would have anything whatsoever to do

2   with those injuries?

3          THE WITNESS:  Oh, no, that would happen any number of

4   ways because the helmet doesn't come into play here.  In

5   other words, the play, itself, does not have enough force to

6   cause an acute subdural hematoma.  But if we assume that some

7   form of an acute subdural hematoma occurs on that play, it

8   wouldn't matter if you had that helmet on, no helmet on, a

9   helmet twice as thick, because whatever that mechanism was is

10  not the traditional mechanism for a subdural hematoma.

11          So it would have to be some kind of spontaneous

12  bleeding or some sort of genetic defect, much like Marfan's

13  syndrome, which black athletes have Marfan's.   It has to do

14  with a collagen defect in the wall of blood vessels.  You see

15  that college basketball player, it happens frighteningly maybe

16  every other year or third year or so, a great athlete goes

17. down the court and all of a sudden just dies.   That collagen

18  defeat eventually allowed blood to leak out into the vessels.

19          THE COURT:  So let's ask the question and see if you

20  can translate it for us lay persons.

21          THE WITNESS:  Yes.

22          THE COURT:  All right, sir.  Is it your opinion that

23  the helmet had nothing whatsoever to do with the jury in

24  question?

25          THE WITNESS:  Right.

Case 1:96-cv-00177   Document 279   Filed in TXSD on 04/13/2001   Page 37 of 47

1    THE COURT:  Even if the injury resulted from that

2    last play?

3         THE WITNESS:  I guess I would have to say yes because

4    the mechanism would not be the traditional mechanism for a

5    subdural.

6         THE COURT:  That's your opinion?

7         THE WITNESS:  Yeah.

8    BY MR. GUERRA:

9    Q    The impact that you see in the NFL, okay, do those by in

10   large substantially exceed the type of impact that you see at

11   the high school level?

12   A    Oh, we are measuring 27 to 32 feet per second.

13   Q    In the NFL?

14   A    Yeah, regularly.

15   Q    And based upon your review of the videotape of the

16   scrimmage that Joe was in, did he ever encounter those kind of

17   forces?

18   A    Well, of course, I didn't analyze it.  I would have to

19   base my opinion on the people that did the analysis.  I guess

20   there are two schools of thought on that.

21   Q    I didn't mean that.  I didn't mean quantitatively,

22   doctor.  I am just talking about based on your experience

23   from having observed NFL hits and based on what you observed

24   from the video on the TV, do you have an opinion as to whether

25   or not Joe sustained any kind of hits anywhere near that kind

Case 1:96-cv-00177   Document 279   Filed in TXSD on 04/13/2001   Page 38 of 47

1262

1   acute subdural hematoma.    In fact, without a helmet on,

2   Q    Speaking of free fall height --

3   A    Your children fall from those heights all the time onto

4   the ground.

5   Q    Without an a helmet?

6   A    Yeah, they get bruises, bumps, contusions, abrasions.

7   Mine did I know anyway playing ball and soccer and lacrosse.

8   Q    But no concussion?

9   A    Right.

10   Q    And if there is no concussion, there is no way they are

11   going to approach the threshold for a subdural hematoma?

12   A    That is correct.

13        THE COURT:    Let me just go back so you can please

14   kindly clarify something.

15        Did I understand you to say that it is your opinion

16   whatever happened to him was not a result of any kind of

17   impact?

18        THE WITNESS:   Right.   There would be an impact

19   commensurate -- when you say whatever happened to him, you

20   mean on the play?

21        THE COURT:  No.   On that play or whenever.

22        THE WITNESS:   Well, obviously he had contact

23   throughout the game.    That is the way football is played.

24        THE COURT:  Yes.

25        THE WITNESS:   And those contacts are in a range below

1  threshold for cerebral concussion.

2  THE COURT: That is what I am asking. Just for

3  clarification, is it your opinion that those contacts in no

4  way had anything to do with the result of whatever he

5  suffered?

6  THE WITNESS: The subdural hematoma.

7  THE COURT: Whatever it was.

8  THE WITNESS: Yeah.

9  THE COURT: That's your opinion?

10  THE WITNESS: Yes.

11  THE COURT: Because the contact had nothing

12  whatsoever to do with it?

13  THE WITNESS: Correct.

14  BY MR. GUERRA:

15  Q  Doctor, just so I can be clear, you are an expert in the

16  area of mechanism of head injury?

17  A  Right.

18  Q  Right?

19  A  Yes.

20  Q  Would you please explain to us in terms that we can

21  understand how it is that a person gets a subdural hematoma.

22  A  Yeah.  We have been talking about the ability of the

23  brain to move inside the cranial vault.  The bridging veins

24  that come off the surface of the brain go into a cavity, a

25  sinus, a sagittal sinus, to drain the venous blood.  On that

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

RAQUEL 0. RODRIGUEZ          §
AND JOSE L. RODRIGUEZ        §
                             §
vs.                          §          CAUSE NO. B-96-177
                             §
RIDDELL SPORTS, INC.,        §
RIDDELL, INC.,               §
ALL AMERICAN SPORTS          §
CORPORATION                  §
d/b/a RIDDELL/ALL AMERICAN;  §
CHRIS HOODMAN; MONARCH       §
RUBBER COMPANY;              §
AND RUBATEX CORPORATION      §

## <u>SWORN AFFIDAVIT OF RICHARD LESTER</u>

BEFORE ME the undersigned Notary Public on this day appeared the person

known to me to be RICHARD LESTER, who first after having been duly sworn and

placed on his oath deposed and stated as follows:

1.      My name is Richard Lester.  I am over twenty-one years of age,

competent to make this Sworn Affidavit.  I have never been convicted of a felony or an

offense involving moral turpitude.  I have personal knowledge of the matters contained

in this Sworn Affidavit and the facts recited herein are true and correct.

2.      I am a duly licensed attorney in the State of Illinois and I am employed as

corporate counsel to Riddell, Inc.  I was present during the trial of Civil Action No. B-96-

177, Rodriguez v Riddell Sports, Inc., March 8, 2001 to March 16, 2001.

3.      Counsel for Plaintiffs called Richard Stalnaker to the witness stand on the

afternoon of March 8, 1999.  The Court gave counsel for plaintiffs a lot of time and a lot

of latitude to establish his credentials.  The trial court allowed Dr. Stalnaker lengthy

opportunity to testify about his education, work history, research and publications and

also admitted his curriculum vitae into evidence.

The trial judge asked questions of Stalnaker to establish his qualifications and his credibility with the jury.  The judge allowed Dr. Stalnaker to leave the witness stand, make use of visual aids and use a laser pointer.   The trial judge did not allow Dr. James McElhaney, a witness for Defendants, to leave the witness stand or to use a pointer to point at certain enlarged photographs; even though he freely allowed Plaintiffs' witness to do so nor did he allow defense counsel to ask the witness his qualifications and background.

4.  At all times during the trial Mr. Summers and Mr. Guerra always acted respectfully toward the court.  However, the judge would scream at counsel for the Defendants, tell them to hurry, interrupt them and make sarcastic comments to them without justification.  He did not do this to the Plaintiffs' attorneys.

5.    Frequently, the trial judge would turn his back to the witness stand when the Defendants' expert witnesses or corporate representatives were testifying or would sit in a position farthest away from the witness.  Sometimes he would shake his head in disbelieve, frown or scowl at the defense witnesses and defense counsel.  On occasion, Judge Vela would "brush off" the testimony of Defendants' witnesses with a wave of his hand.  When the Plaintiffs' witnesses were on the witness stand, Judge Vela would sit in the chair closest to the witness chair and lean forward as if listening intently to their testimony.

6.    The judge also repeatedly referred to the Plaintiff as "a victim" or "the victim" which to a reasonable person would under sympathy. Judge Vela's demeanor, comments and actions indicated that he was not impartial.  His actions, tone of voice and gestures repeatedly showed bias towards the Plaintiffs and prejudiced the defendants which was readily apparent to all present in the courtroom.  Any reasonable person who observed this trial would conclude that Judge Vela was not impartial and showed a personal bias for Plaintiffs and against Defendants.

04/12/01  02:00P  P.004

_(signature)_

Richard Lester

Sworn to and subscribed to before me, on this 12th day of April, 2001.

_(signature)_

Notary Public in and for
The State of Illinois

My Commission Expires: _August 9th, 2001_

> OFFICIAL SEAL
> LINDA CZAJKOWSKI
> Notary Public - State of Illinois
> My Commission Expires Aug 9, 2001

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

RAQUEL O. RODRIGUEZ          §
AND JOSE L. RODRIGUEZ        §
                            §
vs.                          §          CAUSE NO. B-96-177
                            §
RIDDELL SPORTS, INC.,        §
RIDDELL, INC.,               §
ALL AMERICAN SPORTS          §
CORPORATION                  §
d/b/a RIDDELL/ALL AMERICAN;  §
CHRIS HOODMAN; MONARCH       §
RUBBER COMPANY;              §
AND RUBATEX CORPORATION      §

## SWORN AFFIDAVIT OF BARBARA DURAND HOLLIS

BEFORE ME the undersigned Notary Public on this day appeared the person

known to me to be BARBARA DURAND HOLLIS, who first after having been duly

sworn and placed on her oath deposed and stated as follows:

1.      My name is Barbara Durand Hollis.  I am over twenty-one years of age,

competent to make this Sworn Affidavit.  I have never been convicted of a felony or an

offense involving moral turpitude.  I have personal knowledge of the matters contained

in this Sworn Affidavit and the facts recited herein are true and correct.

2.      I am a certified court reporter with Federal Court Reporters of San

Antonio, Texas.  I was present during the trial of Civil Action No. B-CV-96-177,

Brownsville, Texas between March 8, 1999 and March 10, 1999.  I was in the gallery of

the courtroom transcribing those portions of the proceedings that were audible during

the trial.

I observed during the presentation of Riddell's corporate witnesses athat Judge

Vela would frequently swivel his chair so that the back of the chair and the back of his

head was to the witness.  I felt that when he did this he was disinterested in the

-- Page 1 --

witness's testimony and literally turning his back on him.  Whereas during the plaintiffs'
direct testimony he not only faced the  witnesses but frequently leaned forward as
though he were listening intently.

The judge's demeanor, comments and actions during the trial showed that he
favored the plaintiffs and disliked the defense.

Barbara Durand Hollis

Sworn to and subscribed to before me on this 12th day of April, 2001.

Notary Public in and for
The State of Texas

My Commission Expires: _8-21-2002_

IRENE C SOLIS
NOTARY PUBLIC
State of Texas
Comm. Exp. 08-21-2002

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

RAQUEL 0. RODRIGUEZ                §
AND JOSE L. RODRIGUEZ              §
                                   §
vs.                                §        CAUSE NO. B-96-177
                                   §
RIDDELL SPORTS, INC.,              §
RIDDELL, INC.,                     §
ALL AMERICAN SPORTS                §
CORPORATION                        §
d/b/a RIDDELL/ALL AMERICAN;        §
CHRIS HOODMAN; MONARCH             §
RUBBER COMPANY;                    §
AND RUBATEX CORPORATION            §

## SWORN AFFIDAVIT OF PATRICIA VERNON HARRIS

BEFORE ME the undersigned Notary Public on this day appeared the person known to me to be PATRICIA VERNON HARRIS, who first after having been duly sworn and placed on her oath deposed and stated as follows:

1.    My name is Patricia Vernon Harris. I am over twenty-one years of age, competent to make this Sworn Affidavit. I have never been convicted of a felony or an offense involving moral turpitude. I have personal knowledge of the matters contained in this Sworn Affidavit and the facts recited herein are true and correct.

2.    I am a certified court reporter with Federal Court Reporters of San Antonio, Texas. I was present during the trial of Civil Action No. B-CV-96-177, Brownsville, Texas between March 8, 1999 and March 15, 1999. I was in the gallery of the courtroom transcribing those portions of the proceedings that were audible during the trial.

I observed during the presentation of Riddell's corporate witnesses and direct evidence that Judge Vela would frequently swivel his chair so that the back of the chair and the back of his head was to the witness. I felt that when he did this he was

-- Page 1 --

disinterested in the witness's testimony and literally turning his back on them.  Whereas during the plaintiffs' direct testimony he not only faced the witnesses but frequently leaned forward as though he were listening intently.

During the testimony of the defendants expert witnesses, Dr. Lawrence Thibault and Dr. James McElhaney,  the court asked the witnesses in an incredulous tone "would that be your testimony?" and said, "well, that's your opinion",  "So what is it you are telling the jury?".  (Transcript pages 950-954, 1218, 1254-1260, 1262-1263,)  the manner in which Judge Vela did this suggested that the Judge did not find the witness's testimony believable nor did he agree with it.

In my twenty years experience as a court reporter in many courtrooms, I found Judge Vela's treatment of the defense to be unusual, and not what you would expect from an impartial judge.  The judge's demeanor, comments, and actions during the trial showed that he favored the plaintiffs and disliked the defense.



Patricia Harris Vernon

Sworn to and subscribed to before me on this 12th day of April, 2001.

Notary Public in and for
The State of Texas

My Commission Expires: 8-21-2002

IRENE C SOLIS
NOTARY PUBLIC
State of Texas
Comm. Exp. 08-21-2002

-- Page 2 --

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above was forwarded by telefax transmission and certified mail, return receipt requested to counsel of record on this the 13th day of April, 2001.

Mr. Rex Blackburn
**EVANS, KEANE L.L.P.**
1101 W. River Street, Suite 200
P.O. Box 959
Boise, Idaho 83701-0959
VIA FAX 208-345-3514
Telephone 208-384-1800

Mr. Mark D. Kamitomo
**THE MARKAM GROUP, INC., P.S.**
421 West Riverside, Suite 1060
Spokane, WA 99201
VIA FAX 509-747-1992
Telephone 509-747-0902

Mr. J. Arnold Aguilar
1200 Central Blvd.
Artemis Square, Suite H-2
Brownsville, TX 78520
VIA FAX 956-504-1408
Telephone 956-504-1100

Mr. Mark T. Curry
**HUGHES, WATTERS & ASKANASE, LLP**
1415 Louisiana, 37th Floor
Houston, Texas 77002
VIA FAX 713/759-6834
Telephone 713-759-0818

Mr. Ramon Esparza
Renfro, Faulk & Blakemore
185 Ruben M. Torres, Sr. Blvd.
Brownsville, TX 78520
via fax 956-541-9695
telephone 956-541-9600

Robert Summers