281

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
**FILED**

**APR 1 7 2001**

**Michael N. Milby
Clerk of Court**

RAQUEL O. RODRIGUEZ, as legal guardian
of JOSE L. RODRIGUEZ,

      Plaintiff,

vs.

RIDDELL, INC.; and ALL AMERICAN
SPORTS CORPORATION, d/b/a
RIDDELL/ALL AMERICAN,

      Defendants.

Case No. B-96-cv-177

---

## PLAINTIFF'S OPPOSITION TO
## DEFENDANTS' MOTION TO RECUSE

    **COMES NOW** the Plaintiff, by and through her counsel of record, and hereby opposes

Defendants' Motion to Recuse the Honorable Filemon B. Vela on the grounds that Defendants have

failed to sustain their burden of showing that a reasonable person would harbor doubts about Judge

Vela's ability to impartially adjudicate Riddell's case, as he has impartially adjudicated this case

during the first trial.

    Plaintiff's opposition to Defendants' Motion to Recuse is based upon the following:

- Defendants requested identical relief in their appeal to the Fifth Circuit Court of Appeals,
  namely, retrial in front of another judge of the Southern District of Texas. The Fifth
  Circuit denied this relief stating that a "thorough review of the record does not reveal a

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO RECUSE – 1

systematic bias rising to the plain error standard." (Opinion, p. 13, attached as Exhibit D to Defendants' Motion to Recuse and Memorandum in Support.)

- Defendants now rely on "new" post-verdict affidavits of individuals who have a stake in the outcome of the litigation. If the conduct alleged in these affidavits actually existed, these affidavits should have been submitted in Defendants' Motion for a New Trial. Rather, Defendants never objected at trial to the Court's alleged conduct which Defendants contend constitutes evidence of bias against Defendants. Moreover, the allegations contained in these new post-verdict affidavits, as well as the post-verdict affidavits of Defendants' counsel and witnesses submitted to the Court in support of Defendants' Motion for a New Trial, are contradicted by the affidavits of Rex Blackburn, Mark D. Kamitomo and J. Arnold Aguilar (refer to Exhibits A, B and C attached hereto; the original affidavits were submitted to the Court and are filed as Docket No. 213).

- Defendants do not support their Motion with the affidavits of disinterested persons; rather, Defendants rely exclusively on the affidavits of individuals employed by Defendants or Defendants' counsel in support of their Motion. Barbara Durand-Hollis and Patricia Vernon are court reporters hired by Defendants' law firm to transcribe the trial. Their unofficial transcript was filled with personal comments which demonstrate their bias against Judge Filemon Vela. Finally, Defendants rely on an affidavit of Riddell's in-house counsel, Richard Lester, who obviously has an interest in the outcome of this case.

- In his affidavit, Mr. Lester mischaracterizes Judge Vela's reference to Jose as a "victim" during the original trial of this matter. A review of the trial transcript evidences that the Court referred to Jose as a victim two times during a seven day jury trial, not "repeatedly" as stated by Mr. Lester in his affidavit.

- Defendants rely in part upon judicial remarks made by the Court during the course of the trial which are allegedly critical or disapproving of counsel. Judicial remarks which are critical, disapproving or even hostile to counsel, the parties or their cases, ordinarily do not support a bias or partiality challenge. Moreover, expressions of impatience, dissatisfaction, annoyance and even anger, do not establish bias or partiality. *Liteky v. United States*, 510 US 540, 555-56, 114 S. Ct. 1147, 1157 (1994).

- Defendants do not present any evidence that Judge Vela's alleged bias stems from any extrajudicial source. Defendants base their Motion upon questions that Judge Vela asked certain witnesses, his alleged anti-Defendant tone, his cutting off testimony and his alleged gestures on the bench. According to the U.S. Supreme Court in *Liteky*, all of these grounds are inadequate to support a motion for recusal as "[t]hey consist of judicial rulings, routine trial administration efforts and ordinary admonishments (whether or not legally supportable) to counsel and to witnesses. All occurred in the course of judicial proceedings, *and neither* (1) relied upon knowledge acquired outside such proceedings

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO RECUSE – 2

nor (2) displayed deep-seated and inequitably antagonism that would render fair judgment impossible." *Id.*

- Furthermore, at the original trial of this matter, the Court accommodated Defendants' last minute attempt to sandbag Plaintiff by introducing a completely new defense theory and expert witnesses two days before jury selection. Rather than excluding the evidence and the witnesses, the Court allowed Defendants to offer this proof at trial. This supports the conclusion that Judge Vela was impartial and fair to Defendants.

**WHEREFORE,** Plaintiff respectfully requests that the Court deny Defendants' Motion to Recuse.

**DATED** this ⟨17th⟩ day of April, 2001.

EVANS, KEANE LLP

By _____ ⟨signature⟩

Rex Blackburn
State Bar No.3170
Paul J. Augustine
State Bar No. 4608
EVANS, KEANE LLP
1101 W. River Street, Suite 200
P.O. Box 959
Boise, ID  83701-0959
Telephone:  (208) 384-1800
Facsimile:  (208) 345-3514

Mark D. Kamitomo
State Bar No. 18803
THE MARKAM GROUP, INC., P.S.
421 West Riverside, Suite 1060
Spokane, Washington  99201
Telephone:  (509) 747-0902
Facsimile:  (509 747-1993

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO RECUSE – 3

J. Arnold Aguilar
LAW OFFICE OF J. ARNOLD AGUILAR
State Bar No. 00936270
Federal ID No. 6822
1200 Central Boulevard
Artemis Square, Suite H-2
Brownsville, Texas 78520
Telephone: (956) 504-1100
Facsimile: (956) 504-1408

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _17 th_ day of April, 2001, a true and correct copy of the foregoing document was served by first-class mail, postage prepaid, and addressed to; by fax transmission to; by overnight delivery to; or by personally delivering to or leaving with a person in charge of the office as indicated below:

Robert B. Summers
ROBERT B. SUMMERS & ASSOCIATES
P.O. Box 398
Llano, TX 78643

[ x ] U.S. Mail
[ x ] Fax: (915) 248-0110
[   ] Overnight Delivery
[   ] Messenger Delivery

J. ARNOLD AGUILAR

# EXHIBIT "A"

CVisPDF – www.fastio.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

|  |  |
|---|---|
| **RAQUEL O. RODRIGUEZ** and<br>**JOSE L. RODRIGUEZ,**<br><br>Plaintiffs,<br><br>vs.<br><br>**RIDDELL SPORTS, INC.;**<br>**RIDDELL, INC.; and**<br>**ALL AMERICAN SPORTS**<br>**CORPORATION,**<br>**D/B/A RIDDELL/ALL AMERICAN,**<br><br>Defendants. | Case No. B-CV-96-177 |

## <u>AFFIDAVIT OF REX BLACKBURN</u>

STATE OF IDAHO ‎)
‎: ss.
County of Ada ‎)

REX BLACKBURN, being first duly sworn upon oath, deposes and states:

1.    I am an attorney duly authorized to practice before this Court pursuant to an Order of Admission *Pro Hac Vice*, and that I have been designated by the Court as attorney-in-charge relative to the above-captioned action.

2.    I have read the Defendants' Memorandum in Support of Motion for New Trial, and the accompanying Affidavits of Robert B. Summers, Robert L. Guerra, Peter David Halstead,

AFFIDAVIT OF REX BLACKBURN - 1

James H. McElhaney, Barbara Durand Hollis, and Patricia Harris Vernon. To the extent that Defendants' counsel or the identified Affiants state or infer that the Honorable Filemon D. Vela, through his comments, questioning of witnesses, demeanor or other conduct at trial, in any way unfairly influenced the verdict of this action, I categorically disagree with those conclusions and specifically disagree with the representations of counsel and the identified Affiants with regard to the particulars of Judge Vela's conduct which they contend would support such a conclusion.

3.    Judge Vela occasionally questioned witnesses, as was his prerogative under Federal Rule of Evidence 614. Judge Vela questioned witnesses for both the Plaintiffs and the Defendants. This was a lengthy trial involving the testimony of over 30 witnesses and scores of exhibits. The testimony was often highly technical, involving expert witnesses in the disciplines of neurology, neurosurgery, neuropathology, neuroradiology, rehabilitative medicine, biomechanics, product testing and design, actuarial projections of medical care costs, life expectancy, and diminished earning capacity. Given the length and complexity of the trial, and the myriad scientific and technical issues involved, it was not only understandable but expected that Judge Vela would, from time to time, seek clarification of witness testimony by the Court's own questioning. Judge Vela did so, always in an evenhanded and fair manner, without any display of favoritism toward any particular party, and always in an apparent effort to clarify potentially confusing testimony or to crystallize the testimony on contested issues. When one examines the entire record in this case, it is apparent that the Court's questioning was neither quantitatively excessive nor qualitatively biased.

4.    I recall that there was only one occasion on which counsel for Defendants ever objected to any question posed by Judge Vela to any witness. On that occasion, Judge Vela was

AFFIDAVIT OF REX BLACKBURN - 2

questioning the Plaintiff's brother, Juan Rodriguez. Mr. Summers interrupted Judge Vela in mid-question. Mr. Summers was appropriately admonished by Judge Vela not to interrupt the Court while the Court was "asking a question." The Court never stated to any counsel, whether for the Plaintiffs or the defense, that they were precluded from preserving objections to the Court's questioning. Judge Vela merely informed counsel that he was not to interrupt the Court mid-question. On other occasions, the Court similarly admonished counsel for both parties, including the undersigned, that counsel were not to interrupt a witness until the witness had completed his/her response. I considered the Court's admonitions to counsel in general, and to Mr. Summers in particular, to be entirely appropriate under the circumstances.

5.     To the extent that Defendants now suggest that Judge Vela's demeanor while or immediately after questioning witnesses was in any way "disrespectful", "sarcastic", "openly skeptical", "dismissive", or in any other manner judicially inappropriate, these allegations are pure fabrication. Of all counsel at trial, given my position at counsel's table, I was seated closest to the witness and Judge Vela when he was seated in the left-most (from my perspective) chair at the bench. At no time was his tone of voice or demeanor disrespectful, skeptical, or otherwise demeaning toward a witness. He never made a gesture which could reasonably have been interpreted as "dismissive" of or "brushing off" a witness. I observed Judge Vela to simply gesture toward counsel with his hand when Judge Vela had completed his questioning of the witness, apparently signifying to counsel that they were to resume questioning.

6.     Judge Vela did, from time to time during the course of the trial, sit in other than the left-most chair at the bench. There were three chairs at the bench. I observed him to occasionally move from the left-most chair (from my perspective) to the right-most chair at the

bench. I observed him to do so only when (1) counsel were providing videotaped testimony which did not require the Court to rule on objections; (2) he was reviewing documents handed to him by a law clerk, or was conferring with a law clerk; or (3) he wished to speak to counsel outside the presence of the jury. This conduct could not reasonably have been interpreted by anyone as judicially inappropriate.

7.     On occasion, I saw Judge Vela swivel his chair so that he was not looking directly at a particular witness or at counsel while counsel was addressing the jury. I recall specifically that Judge Vela did so while I was giving the opening statement to the jury. I recall that he also did so on occasions when witnesses were being examined by me or other Plaintiffs' counsel, and on occasions when the witnesses were being examined by counsel for Defendants. It occurred occasionally when witnesses for the Plaintiffs were testifying, and while witnesses for the Defendants were testifying. This behavior by the Court could not reasonably have been interpreted by anyone as exhibiting inappropriate judicial decorum. From my observations, His Honor Judge Vela was doing nothing more than repositioning himself for reasons of comfort during a long trial.

8.     Dr. McElhaney suggests that the Court questioned him inappropriately at one point during the Court's examination of him. Dr. McElhaney was asked a question by the Court regarding whether Plaintiff Jose Rodriguez could have physically performed in the manner he did if, as Dr. McElhaney and other defense witnesses suggested, he suffered from a preexisting subdural hematoma. In response to Judge Vela's question, Dr. McElhaney emphatically testified that the Plaintiff could have done so. I had asked Dr. McElhaney the same question in deposition before trial. At that time, Dr. McElhaney testified under oath that he could not answer the

question because it was beyond his expertise to do so. After Dr. McElhaney was impeached with this rank inconsistency, the Court properly asked him why he was able to answer the question for the Court but not for me in deposition. Dr. McElhaney was not able to provide a credible explanation for the inconsistency. While he undoubtedly was, and certainly should have been, embarrassed by this revelation of his "intellectual flexibility," he alone was responsible therefor. He should have informed the Court that he lacked the expertise to answer the question. If he had an explanation for why he was qualified at trial to render the opinion, he should have given it. It was entirely appropriate for the Court to inquire as it did.

9. The representations of counsel for the Defendants to the effect that the Court "openly berated" or "loudly criticized" counsel for Defendants, or in any other fashion acted toward counsel in a judicially inappropriate fashion, are also fabricated. While the Court occasionally admonished counsel for the Plaintiffs and counsel for the Defendants, Judge Vela always did so for legitimate reasons, and in a judicially appropriate manner.

10. Mr. Guerra represents that Judge Vela "loudly criticized" him in conjunction with the examination of Richard Goka. Judge Vela, in fact, expressed his displeasure with Mr. Kamitomo (counsel for the Plaintiffs) and Mr. Guerra (counsel for Defendants) when they did not conduct the examination of Dr. Goka in a manner which Judge Vela properly considered to be less than optimally efficient. Judge Vela specifically advised the jury in this context that his admonitions were directed to both counsel.

11. On other occasions, Judge Vela admonished counsel, including me, that they were not to address the Court without first standing, even while interposing objections to opposing counsel's examination of a witness. Judge Vela insisted that all counsel request permission of the

AFFIDAVIT OF REX BLACKBURN - 5

Court before approaching a particular witness. Mr. Summers repeatedly ignored the Court's direction in this regard, and for that reason was repeated advised by Judge Vela that he was not to approach a witness without first requesting the Court's permission.

12.     The representations of defense counsel that they or their witnesses were not otherwise permitted to freely move about the courtroom, to illustrate testimony by the use of charts or other illustrative devices, are simply inaccurate. Mr. Guerra and Mr. Summers routinely questioned witnesses from a position immediately adjacent to the jury box. Witnesses for both the Defendants and the Plaintiffs were routinely granted permission to leave the witness stand. I recall that on only one occasion did the Court deny defense counsel's request that the witness be allowed to leave the stand. This involved the testimony of Dr. McElhaney, who had previously been using a laser pointer to identify portions of videotape or photographic evidence, and was permitted to do so after Mr. Summers' request was denied.

13.     Representations by counsel for the Defendants that the Court "screamed" or "yelled" at counsel for Defendants for making objections are simply not true. At no time did the Court do so. Nor did the Court inappropriately "hurry" or "interrupt" counsel, or address counsel with "sarcastic comments". From time to time, the Court appropriately admonished counsel for the Plaintiffs and counsel for the Defendants to expedite questioning of witnesses, particularly on non-critical or cumulative matters.

14.     At no time did counsel for the Defendants ever object to the demeanor or conduct of Judge Vela, either on the record or informally to counsel for Plaintiffs.

15.    The Court instructed the jury, at the beginning of the case and in the final charges, that the jury was not to interpret any of the Court's questions or comments as displaying favoritism toward or bias against any party in the action.

16.    The Court's impartiality is demonstrated by some of its most significant rulings at trial.   The Court permitted counsel for Defendants to disclose two new experts, Lawrence Thibault and Robert Jones, only two days before jury selection.   These experts, in combination with the revised testimony of Dr. Ommaya, offered an entirely new medical causation defense at literally the eleventh hour prior to trial.   Over objection of Plaintiffs' counsel, the Court permitted Defendants to call these newly disclosed experts and to pursue the previously undisclosed defense. Moreover, the Court represented to counsel, on the record, before the jury had rendered its verdict that, although the Court would permit the jury to consider the question of punitive damages, the Court would not ultimately allow recovery of damages if awarded.   These significant rulings demonstrate Judge Vela's impartiality.

17.    Defendants' counsel suggest that the presence of Jose Rodriguez at trial was unduly prejudicial and warrants a new trial.   Jose was present in court for only part of the morning of the first day of Plaintiffs' case in chief.   He was present in court before the jury was brought into the courtroom.    While in court, he was seated in a wheelchair positioned behind the rail, approximately 40 or 50 feet from the jury box.   At no time, either before or after the jury was brought to the courtroom, did counsel for Defendants ever object to Jose's presence or to any of his behaviors while he was present in the courtroom.   Jose's limited presence in the courtroom was in no way disruptive or unduly prejudicial.   On two or three occasions he merely sighed or groaned in a manner that could be heard by those present in the courtroom.   Although he is

AFFIDAVIT OF REX BLACKBURN - 7

obviously injured, the evidence of his condition was properly communicated to the jury and was relevant to the issues in the case. The jury heard evidence of his condition through several witnesses and saw a videotape of him and his care in a home setting. The jury did not appear to be affected by his presence. None of the jurors cried or was otherwise emotive while he was present.

18.     The only displays of emotion by the jury were the following. During the testimony of Mrs. Rodriguez, two of the female jurors appeared to briefly cry during her direct examination, and also during her cross-examination by Mr. Guerra when he elected to extensively question her about Jose's significant medical problems since his injury and to refer to Jose as "mean". Again, during a portion of the Plaintiffs' closing argument, one of the female jurors briefly cried.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

_____
REX BLACKBURN

SUBSCRIBED AND SWORN TO before me this _13th_ day of May, 1999.

_____
Notary Public for Idaho
Residing at Boise, Idaho
My Commission expires: _7-8-00_

AFFIDAVIT OF REX BLACKBURN - 8

# EXHIBIT "B"

CVISPDF – www.fastio.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | |
|---|---|
| RAQUEL O. RODRIGUEZ and<br>JOSE L. RODRIGUEZ,<br><br>Plaintiffs,<br><br>vs.<br><br>RIDDELL SPORTS, INC.;<br>RIDDELL, INC.; and<br>ALL AMERICAN SPORTS<br>CORPORATION,<br>D/B/A RIDDELL/ALL AMERICAN,<br><br>Defendants. | Case No. B-CV-96-177 |

## AFFIDAVIT OF MARK D. KAMITOMO

STATE OF WASHINGTON)

County of Spokane         ) : ss.

MARK D. KAMITOMO, being first duly sworn upon oath, deposes and says:

1.     I am one of the attorneys who tried this case, am over the age of 18 years, and am competent to testify as to the matters herein.

2.     I make this Affidavit in response to those allegations set forth in Defendants' Motion for a New Trial and accompanying affidavits.

3.     At trial, I presented the direct testimony of Dr. Richard Goka, a future life care specialist, on behalf of the Plaintiffs. During the course of Dr. Goka's testimony, the Court

AFFIDAVIT OF MARK D. KAMITOMO - 1

decided to admit as Court's Exhibit No. 1, a flip-chart setting forth Jose Rodriguez's expected future medical care expenses.  In the course of so doing, the Court told both Mr. Guerra and me that our responses to his questions did not honor the jury's time.  At no time did I perceive that the Court was attempting to influence the jury on behalf of either side.  To the contrary, at one point, the Court  told the jury that he was not intending to refer to one side and in fact was referring to both sides.  Finally, although Defendants had the opportunity to produce an expert witness of their own on future medical costs, they declined to do so.  Mr. Guerra's attempt to impugn the impartiality of Judge Vela is absolutely unjustified in light of my personal observations at trial.

4.      At page 26 of their Motion, Defendants state that the trial judge allowed great latitude to Plaintiffs' witnesses, which included allowing them to make charts and exhibits and use audiovisual aids in the courtroom, but would deny the same to defense counsel and their witnesses.  This is simply not true.  Throughout the course of the trial, both sides were permitted to utilize charts and audiovisual aids in the presentation of their case.  To the best of my recollection, the Defendants were allowed to utilize every single exhibit they offered at trial.  Finally, Judge Vela allowed the Defendants great latitude and flexibility in the presentation of their case.  In particular, during the testimony of defense expert James McElhaney, Defendants produced for the first time a large demonstrative exhibit setting forth frame-by-frame images taken from the actual football video.  Even though Defendants had never produced the exhibit nor made Plaintiffs aware that it would be utilized at the time of trial, the Court nonetheless allowed Defendants to utilize the exhibit in the presentation of Mr. McElhaney's testimony.  There are many other examples set forth in the written record which evidence Judge Vela's objectivity and

AFFIDAVIT OF MARK D. KAMITOMO - 2

evenhandedness in allowing both sides to present their case with as much latitude as he thought was proper under the rules.

5.      Also on page 26 of their Motion, Defendants claim that Judge Vela, through his demeanor, acted as though he did not believe the testimony of defense witnesses. This is simply not true. Judge Vela would, at times, question witnesses, including Plaintiffs' witnesses, for clarification purposes. At no time did I witness Judge Vela, though his demeanor, act in a way that would lead the jury to believe Judge Vela was attempting to discredit the testimony of any defense witness. Judge Vela treated all witnesses with the utmost respect. Further, at no time did I witness Judge Vela turn his back in a dismissing fashion on any of the Defendants' witnesses. To the best of my recollection, the only witness the Judge turned his back to was Plaintiffs' expert witness, Dr. Richard Goka, the life care planner. When he did so, at no time did I get the impression he was attempting to discredit the testimony of Dr. Goka. Further, it was clear from his questions that the Court listened to Dr. Goka's testimony at all times.

6.      On pages 37, 38 and 39, Defendants claim that the Court unfairly allowed Plaintiffs to provide rebuttal testimony from various expert witnesses. Regarding neuropathologist Hannes Vogel, M.D., Defendants fail to mention that due to their last minute disclosure of pathological evidence and witnesses two days prior to trial, Plaintiffs were forced to retain a neuropathologist to rebut Defendants' new, previously undisclosed, testimony regarding pathological evidence. With respect to neuroradiologist Gary Stimac, M.D., Plaintiffs were not afforded an opportunity to determine the need for rebuttal expert testimony until after Defendants' experts Drs. Ayub Ommaya and Thomas Gennarelli were deposed in November of 1998. During his deposition, Dr. Ommaya raised the issue of subgaleal/extracranial damage. Shortly thereafter, Plaintiffs

AFFIDAVIT OF MARK D. KAMITOMO - 3

offered the testimony of neuroradiologist Dr. Gary Stimac to rebut Dr. Ommaya's subgaleal edema evidence. The Court then allowed Defendants an opportunity to secure a surrebuttal neuroradiologist. Defendants were unable to find a credible neuroradiologist that would support their position.

7.    At no time did Plaintiffs fail to disclose any pathological evidence to Defendants. Pursuant to joint stipulation, the records were obtained by Compex Legal Services, Inc. and a complete copy given to each side in early 1998. These records referenced the pathology slides of Plaintiff's subdural clot that were preserved at Valley Baptist Hospital and were the basis of Defendants' last minute evidence. Despite having these records in their possession for as much as one year prior to trial, Defendants waited until March 3, 1999, two days before selection of the jury, to disclose what they characterized as new neuropathologic evidence. Despite Plaintiffs' objections, the Court allowed the Defendants to utilize the new evidence and their witnesses with the proviso that Defendants make them available for deposition in Brownsville at 9 a.m. on March 5, 1999. Further, the Court allowed Plaintiffs the opportunity to secure a rebuttal witness to the neuropathologic evidence. Despite the short period of time, Plaintiffs were able to do so and adequately rebut the evidence. As a result of Defendants' actions, Plaintiffs incurred an additional expense of approximately $15,000 to secure the testimony of neuropathologist Hannes Vogel, M.D., on the pathology issue.

8.    Due to Defendants' last minute disclosure of Dr. Thibault (who had not been disclosed as an expert until March 3, 1999) and Dr. Ommaya regarding pathology evidence, I was required to attend their depositions at J. Arnold Aguilar's office in Brownsville on March 5, 1999. Robert Guerra, counsel for Defendants, was also present at the depositions of Drs. Thibault and

Ommaya.  Robert Summers was not present at these depositions.  I also missed jury selection and opening statements.

9.     On Friday, March 5, 1999, I met with Dr. Fennegan at his office.  At that meeting, Dr. Fennegan advised me that he did not wish to testify at trial.  I indicated to Dr. Fennegan that if he signed an Affidavit confirming what he had told me regarding his lack of any basis for opinions regarding mechanism of injury, the Plaintiffs would not call him to testify at trial.  I drafted an Affidavit for his signature which reflected his comments to me during this meeting. I specifically told Dr. Fennegan that I could not tell him whether the Defendants would call him at trial.  I did not tell him that if he signed an Affidavit, he would not have to testify at trial. During our meeting I also showed Dr. Fennegan the CT scans taken of Jose Rodriguez taken the day of Jose's injury.  After reviewing the scans he told me he could see the subgaleal edema or excranial damage to the scalp in the scans.  In the opinions of Defendants' own experts, particularly Dr. Ommaya, the existence of such an injury evidenced that the helmet "failed".  I suspect that the Defendants' decision not to subpoena Dr. Fennegan was related to this potentially harmful testimony by Dr. Fennegan.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

MARK D. KAMITOMO

SUBSCRIBED AND SWORN TO before me this _10th_ day of May, 1999.

Notary Public for Washington
Residing at _____
My Commission expires: _12-9-2001_

AFFIDAVIT OF MARK D. KAMITOMO - 5

# EXHIBIT "C"

CitsPDF - www.fastio.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| RAQUEL O. RODRIGUEZ and | § | |
| JOSE L. RODRIGUEZ | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. |
| | § | |
| RIDDELL SPORTS, INC., RIDDELL , | § | B - 96 – 177 |
| INC., ALL AMERICAN SPORTS | § | |
| CORPORATION d/b/a RIDDELL/ALL | § | |
| AMERICAN | § | |

---

## AFFIDAVIT OF J. ARNOLD AGUILAR

---

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF CAMERON | § |

BEFORE ME, personally appeared **J. ARNOLD AGUILAR**, who is personally known to me, and first being duly sworn according to law upon his oath deposed and said:

1. I was present during the entire trial of Cause No. B-96-177, Raquel O. Rodriguez and Jose L. Rodriguez vs. Riddell Sports, Inc., et. al., except for a few moments when I left the court room briefly.

2. The Trial Judge's questioning of witnesses did not cloak any of them with any authority or lend any credence to their testimony. To the contrary, the Trial Judge asked questions to expert witnesses called by Plaintiffs and Defendants, asking those witnesses to explain their testimony in simpler terms, "for us lay persons." The Trial Judge did not allow any more latitude to Plaintiffs' witnesses than he allowed to Defendants' witnesses to the use of charts,

D:\OC\Motions\98-106.aff                                    PAGE 1

exhibits, and audio visual aids in the court room. For that matter, the greater bulk of audio-visual aids and exhibits were used by the Defense, including a 6'x 6' screen, two head forms, and numerous other exhibits. Specifically, a number of Defendants' experts, including Dr. James McElheny, were allowed to use a laser pointer and a stick pointer to present testimony throughout the trial. The Trial Judge even allowed Defendants to parade a series of college and pro football helmets with logos of local teams in view of the jury, although they were never admitted into evidence.

3.    At no time did the Trial Judge make any "brushing off" or "dismissing" motions with his hand. The only hand gestures he ever made were to notify the attorney questioning a witness that he could proceed with his questioning. Although the Trial Judge may have looked like he was frowning at different times, this appeared to be more an effort to concentrate on the complicated, technical nature of the testimony, rather than a comment on it.

4.    The Trial Judge did not only face the witnesses and sit in the chair closest to the jury only while Plaintiffs' witnesses were testifying, nor did he turn his back to the witnesses or move to the chair furthest from the jury box while only the Defendants' witness were testifying. The Trial Judge would occasionally look away from the witnesses, whether they were called by the Plaintiffs or Defendants. Similarly, he would occasionally move to the other side of his bench during the testimony of Plaintiffs' and Defendants' witnesses, but it was not in any consistent or discriminatory manner. I specifically recall one instance

in which Plaintiffs' attorney Mark Kamitomo was questioning a witness, at which time the Trial Judge was sitting at the far end of the bench. The Trial Judge called me and Defense attorney Robert Guerra to the bench to discuss a minor matter. I have tried over eight cases to the Trial Judge and I have found that he regularly moves to different parts of his bench, with no apparent reason for doing so.

5. The Trial Judge never acted as an advocate for Plaintiffs or Defendants in asking any questions or making any comments. Although the Trial Judge occasionally did interrupt the lawyers while they were questioning the witnesses, he interrupted Plaintiffs' attorneys as often as he did Defendants'. This did not prevent either side from making a full presentation of the evidence, because after he finished his questioning, he gestured to the attorney he had interrupted to continue their line of questioning. The Trial Judge did not allow Plaintiffs' attorneys to approach witnesses without first asking permission; he did not chastise or reprimand Plaintiffs' counsel, or did so on only few occasions, because Plaintiffs' attorneys specifically requested permission each time before they approached a witness. Defendants' attorneys, on the other hand, were given quite a bit of leeway at first, when they would approach witnesses without requesting permission, but after numerous violations, the court began to simply instruct Defendants' attorneys to request permission to approach witnesses. Notwithstanding, Defendants' attorneys continued to approach witnesses without seeking permission to do so, and the Trial Judge had to continue to remind them

to seek permission first. This may have also been because of the disrespectful manner in which Defendants' attorneys were questioning and approaching witnesses. I also recall at least two instances when Plaintiffs' attorney Rex Blackburn was also reprimanded by the Trial Judge for not standing while addressing the Court.

6.     Defendants' counsel, Mr. Summers and Mr. Guerra, did not always act respectfully towards the court, as evidenced by their tossing exhibits at the Court Clerk, acting flippantly towards certain witnesses and evidence, tearing a pad out of the subject football helmet, and numerous other gestures. Nor did Defense Counsel act respectfully towards Plaintiffs' Counsel. As an example, on the first day of trial, March 8, 1999, before the Trial Judge had taken the bench, Defendants' attorney Robert Summers approached Plaintiffs' attorney Mark Kamitomo and attempted to remove him from his seat. When Mr. Kamitomo did not relinquish his seat, Mr. Summers went so far as to physically shove Mr. Kamitomo aside. Mr. Kamitomo exercised great restraint in not responding in kind to Mr. Summers' attempted physical intimidation.

7.     Although the Trial Judge did tell the jury in open court that he did not agree with what the lawyers were doing on March 9, 1999, Defendants' mischaracterize the effect of this statement. This comment was actually made while Plaintiffs' attorney Kamitomo was asking Dr. Richard Goka to discuss the various expenses involved in establishing Jose Rodriguez' Life Care Plan. Although Plaintiffs wanted to present this testimony in detail in order to

establish the numerous difficulties and expenses that would be incurred, the Trial Judge ordered us to simply present the information, without any discussion. The Trial Judge chastised Plaintiffs' attorneys, not the Defendants' attorneys, for " wasting the jury's time." After this presentation, Defendants were fully allowed to cross examine Dr. Goka on all matters relating to his testimony and the Life Care Plan.

8.    The Trial Judge did not rush the Defendants' lawyers to not object or to stipulate to exhibits.  To the contrary, there were numerous times when Defendants' attorneys did object, and he would require Plaintiffs' attorneys to prove up those exhibits.  Perhaps the "rush" felt by Defendants' attorneys was because they did not prepare their objections to any particular exhibits in advance of trial, in spite of the fact that exhibit lists had been exchanged between the parties weeks earlier.  Having tried numerous cases in front of Judge Vela I know he expects the attorneys to have reviewed the other side's exhibits in advance and be prepared with any objects at the time those documents are submitted.  Defendants' attorneys' failure to be prepared meant that the court had to wait while Defense counsel reviewed certain documents.

9.    Although the Trial Judge may not have allowed Dr. James McElhaney to leave the witness stand or to use a wooden pointer to point at certain enlarged photographs (I do not recall whether he did or not), I do recall that he did let this witness approach the 6'x 6' video screen on numerous occasions, with a

play, contrary to the testimony of other witnesses.  When the Trial Judge asked one or more witnesses to assume Joe Rodriguez had no pre-existing condition before the scrimmage, again I believe the Trial Judge was offering Defendants' experts an opportunity to provide other explanations of what might have caused his injuries.

11.  The Trial Judge would occasionally turn his back to the witness stand when both Plaintiffs' and Defendants' witnesses were testifying, with no apparent reason for doing so.  Although he may have frowned or scowled at the lawyers for both the Plaintiffs' and Defendants', this would only occur when the attorney or attorneys were unnecessarily delaying the proceedings.  At no time did I see the Trial Judge "brush off" the testimony of any witnesses with a wave of his hand, although he would occasionally notify one of the attorneys to continue asking questions by waving his hand.

12.  On the morning of March 8, 1999, Plaintiff Jose L. Rodriguez was in the court room in his wheel chair, which leaves him in a supine position.  He was only present for that morning.  At no time did he moan or sigh, but occasionally he did groan loud enough for others to hear him.  I do not believe this was an intentional act, but merely a reaction to his condition.  Contrary to Defendants' representations, the jurors were not physically shaken by the sight of Mr. Rodriguez, nor did any of the women have tears in their eyes at that time.  The jurors' reaction on seeing Mr. Rodriguez at that time actually concerned me because none of them appeared to be at all affected by his condition, and they

pointer, to discuss a significant portion of his testimony. On other occasions, he would use a laser pointer to direct the jury's attention to different matters.

10. Although the Trial Judge asked various hypothetical questions of various witnesses, none of them were contrary to the facts in evidence, and I interpreted that the Trial Judge was actually attempting to allow the Defense an opportunity to have alternative theories for their case. I recall one particular hypothetical asked of one of the witnesses, following the deposition testimony of Defendants' expert Dr. Ayub K. Ommaya. Dr. Ommaya had testified that Joe Rodriguez' head had never actually hit the ground, and this was the basis for the witness' conclusions. Mr. Ommaya had continued to assert that because Mr. Rodriguez' head never hit the ground, he could not have been injured in the event play. During the testimony of Dr. Ommaya, I saw two jurors with facial expressions indicating disbelief, and then looking quizzically at the Defendants' attorneys'. The hypothetical asked by Trial Judge was actually an attempt to allow Defendants' expert to establish an alternative basis for Mr. Rodriguez' injury, in the event the jury found that this play did cause some injury to Mr. Rodriguez. In spite of the video tape of the event play that specifically showed Mr. Rodriguez' head hitting the ground, Defendants did not present any other sufficient explanation to justify the extent of his injuries, if the jury were to find that Mr. Rodriguez had been injured during that play. In spite of this opportunity, Defendants continued to assert that this was a rotational, not a translational, injury and that he was not injured in any manner during the event

would only glance at him occasionally. During his presence, the jurors' attention was focused on the witnesses who were testifying, and they looked at Mr. Rodriguez only occasionally, with no apparent effect. Some jurors looked at Mr. Rodriguez curiously, as if trying to evaluate his condition. Because of the significance of this case, I was concerned that the jurors did not seem to be very affected at all. The first, and possibly only, time I saw jurors cry was when Defendants' attorney Guerra started asking Mrs. Rodriguez inappropriate and insensitive cross-examination questions. By this time, Mr. Rodriguez had been out of the court room for at least one and one half days.

13. The perception of the Jury's attitude toward Defendants was not caused by any actions of the Trial Judge but instead reflected their impression of Defendants' counsel's "big city" attitude, showing a callous indifference to the Plaintiffs and the loss suffered by this family. An example of this attitude was when Defendants attorney Guerra accused Mr. Rodriguez of being a "mean" person and by attorneys Guerra and Summers taking a flippant, smug approach to the questioning of a number of witnesses.

14. In reviewing the list of jurors, I recall one was retired, another was a Field Supervisor, another was a Labor Foreman, and another was a teacher. I do not recall any other jurors being in a "higher" socio-economic class than these members that were eventually selected to the jury, and I believe this jury did reflect the community, in which I reside. Plaintiffs did not intentionally strike

any individual jurors because of their "higher" educational level or economic status.

15.  I first received the expert reports of Dr. Ommaya and Dr. Thibault, dated March 3, 1999, on March 3, 1999 at 4:10 p.m. by telefax transmission.  At this time, all co-counsel were already in transit on their way down to Brownsville, Texas, and were not available to receive this telefax at their offices.

Further affiant sayeth not."

                                                    J. ARNOLD AGUILAR

        SUBSCRIBED AND SWORN TO BEFORE ME by the said J. ARNOLD AGUILAR on this the __13th__ day of May, 1999, to certify which witness my hand and official seal.



                                                    Notary Public, State of Texas

                                                    Frances Peña
                                                    Notary's Printed Name

                                                    My Commission Expires:
                                                    03/27/03