Case 1:96-cv-00177 Document 291 Filed in TXSD on 04/25/2001 Page 1 of 9

United States District Court
Southern District of Texas
FILED

APR 25 2001

Michael N. Milby
Clerk of Court

COPY

291

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| RAQUEL O. RODRIGUEZ AND JOSE L. RODRIGUEZ | § | |
| VS. | § | CIVIL ACTION NO. B-CV-96-177 |
| RIDDELL SPORTS, INC. RIDDELL, INC. ALL AMERICAN SPORTS CORPORATION D/B/A RIDDELL/ALL AMERICAN AND CHRIS HOODMAN | § | |

RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE CONCERNING EPIDEMIOLOGICAL AND STATISTICAL EVIDENCE

TO THE HONORABLE JUDGE OF SAID COURT:

Now comes Riddell, Inc. and All American and file this their Response in Opposition to Plaintiff's Motion in Limine pertaining to Defendant's Epidemiologist and statistical evidence and would request an evidentiary hearing so that defendant can properly predicate the opinions of Dr. Kenneth Clarke and in support of same would show the court the following:

I.

Plaintiff's argue that Dr. Clarke's testimony is predicated upon Dr. Joseph Torg's data which was found by an Illinois Appellate Court to be unreliable. The Galindo decision cited by Plaintiff is not *stare decisis* binding on this court nor is the holding in fact case determinative of the issue herein. That case concerned the testimony of Dr. Joseph Torg not Dr. Clarke. Dr. Torg, an orthopedic surgeon interested in catastrophic neck injuries occurring in football, began a data collection based on catastrophic head and neck injuries in the early 1970s. The court excluded Dr. Torg's survey as hear say,

ClibPDF - www.fastio.com

stating that the Defendant laid no foundation for it's scientific accuracy. In this case Dr. Clarke's reliance on the Torg data is limited to historical perspective and not to his opinions pertaining to the relevant period of time or the utility of the VSR-4 helmet.

It is significant to note, however, that Dr. Clarke's conclusions and opinions based on historical data back to 1970 have wide acceptance in the field of sports safety and both the survey results and conclusions therefrom have been accepted by the sponsors of the 1978 Annual Survey of Football Fatalities; American Football Coaches' Association, the National Collegiate Athletic Assoc., the National Federation of State High School Association and the Consumer Production Safety Commission. (See Ex 1, 45 Fed. Reg. #197, 9/24/80, page 63327, findings of the Consumer Product Safety Commission citing the National Football Head &Neck Injury Registry data and conclusions along with the National Athletic Injury Illness Reporting System (NAIRS) and finding" "the final report of this CPSC supported effort stated that the evidence does not support helmet causation of "head injuries". In addition, the NAIRS report stated no particular "hard-shelled" helmet was associated with a disproportionate number of concussions ...", Id at 63327.

The main data source for Clarke's analysis is the National Football Head and Neck Injury Registry, now the National Center for Catastrophic Sports Injury Research. In 1980 Frederick O. Mueller, PhD, University of North Carolina at Chapel Hill (UNC-CH) was appointed by the American Football Coaches Association (AFCA), the National Collegiate Athletic Association (NCAA) and the National Federation of State High School Association (NFSHSA)to continue research began by Dr. Carl Blythe at that institution under the new title "American Survey of Football Injury Research". As

ClibPDF - www.fastio.com

the testimony of Dr. Clarke will show this report commissioned by the NCAA, AFCA & NFSHSA is considered trustworthy and is relied upon by experts in the field concerned with sports safety issues. The annual report is reviewed and relied upon each year by coaches, trainers, medical practitioners and epidemiologists in making decisions on rule changes, coaching techniques, equipment selection and risk factors associated with football and other sports now included in the registry. The data collected by Dr. Mueller's organization forms the basis of numerous peer reviewed publications widely accepted in the field including publications such as "Catastrophic Injuries in High School & College Sports", Muller, Cantu, Van Camp, Human Kinetics - Sports Science Monograph Series, 1996.

Dr. Clarke's conclusions and opinions have wide acceptance, Dr. Clarke's testimony that the relative infrequency of catastrophic brain injuries in high school football is inconsistent with the allegation of a defective football helmet in common use (such as the VSR-4) is not a medical opinion, as Plaintiffs contend, but an epidemiological one which refutes Dr. Stalnaker's opinion that a person wearing a VSR-4 helmet has an 8 to 18% risk of receiving an AIS injury of 4 or greater, which could include an injury such as Jose Rodriguez's (SF 357-359). In fact Dr. Clarke's testimony is one of the key factors mitigating against the credibility of Dr. Stalnaker's conclusion since the Plaintiffs' expert opinions are contrary to statistical and epidemiological evidence, long recognized in the field.

WHEREFORE, PREMISES CONSIDERED, defendants pray that the Court deny Plaintiffs' Motion in Limine pertaining to Defendant's Epidemiologist and statistical evidence and for all such further relief, general, special, legal and equitable which

ClibPDF - www.fastio.com

might be appropriate.

Respectfully submitted,

ROBERT B. SUMMERS & ASSOCIATES
P. O. Box 398
Llano, Texas 78643
(915) 248-0033-Phone
(915) 248-0110-Fax

BY ______________________
ROBERT B. SUMMERS
State Bar No. 19507000
ANN H. MEGEE
State Bar No. 13902700
Attorneys for Defendant
Riddell, Inc.

THORNTON, SUMMERS, BIECHLIN,
DUNHAM & BROWN, L.C.
418 E. Dove
McAllen, Texas 78504
956-630-3080 Telephone
956-630-0189 Facsimile

BY: ______________________
Robert L. Guerra
State Bar No. 08578560
Attorneys for Defendant Riddell, Inc.

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above was forwarded by telefax transmission and certified mail, return receipt requested to counsel of record on this the 25th day of April, 2001.

Mr. Rex Blackburn
**EVANS, KEANE L.L.P.**
1101 W. River Street, Suite 200

ClibPDF - www.fastio.com

P.O. Box 959
Boise, Idaho 83701-0959
VIA FAX 208-345-3514
Telephone 208-384-1800

Mr. Mark D. Kamitomo
**THE MARKAM GROUP, INC., P.S.**
421 West Riverside, Suite 1060
Spokane, WA 99201
VIA FAX 509-747-1993
Telephone 509-747-0902

Mr. J. Arnold Aguilar
1200 Central Blvd.
Artemis Square, Suite H-2
Brownsville, TX 78520
VIA FAX 956-504-1408
Telephone 956-504-1100

Mr. Mark T. Curry
**HUGHES, WATTERS & ASKANASE, LLP**
1415 Louisiana, 37th Floor
Houston, Texas 77002
VIA FAX 713/759-6834
Telephone 713-759-0818

Mr. Ramon Esparza
Renfro, Faulk & Blakemore
185 Ruben M. Torres, Sr. Blvd.
Brownsville, TX 78520
via fax 956-541-9695
telephone 956-541-9600

Robert Summers

ClibPDF - www.fastio.com

04/25/01 09:30A P.005

FROM : WHO'S YOUR_DADDY?? FAX NO. : 2104922755 Apr. 25 2001 09:25AM P1

9-24-80
Vol. 45 No. 187
Pages 63261-63478

# federal register

Wednesday
September 24, 1980

## Highlights

Briefings on How To Use the Federal Register—For details on the resumption of briefings in Washington, D.C., see announcement in the Reader Aids section at the end of this issue.

63475 Occupational Safety and Health Labor/OSHA reopens rulemaking record for lead standard; comments by 10-27-80; hearings on 11-5, 11-6 and 11-7-80 (Part IV of this issue)

63467 Wage and Price Controls CWPS extends second-year price standards; effective 10-1-80; comments by 10-30-80 (Part III of this issue)

63263 Excise Taxes Treasury/IRS issues interim rule and proposes rule for determining base prices for tier 2 and tier 3 oil; effective with respect to oil removed after 2-29-80; comments by 11-[illegible]-80 (2 documents)

63286 Truth in Lending FRS proposes staff interpretation regarding security interest disclosures in closed end credit transactions; comments by 10-[illegible]-80

63410 Treasury Notes Treasury/Sec'y announces the interest rate on Series W—1982 will be 11⅞ percent

63325 Football Helmets CPSC denies petition requesting issuance of standards

CONTINUED INSIDE

04/25/01 09:30A P.006
FROM : WHO'S YOUR_DADDY?? FAX NO. : 2104922755 Apr. 25 2001 09:26AM P2

85328 Federal Register / Vol. 45, No. 187 / Wednesday, September 24, 1980 / Notices

is being published in response to a request from the ICSP.

The ICSP has reviewed a proposed national standards policy for the United States developed by the National Standards Policy Advisory Committee (NSPAC), established in 1977 under the auspices of the American National Standards Institute, and published in December 1978. At its plenary session on June 11, 1980 the ICSP adopted the following resolution, with no member dissenting but with one abstention, regarding [not] the policy aspects of the NSPAC document. [It made no observation with regard to the recommended implementation plan for the proposed national policy which was included as a separate and distinct part of the NSPAC report.]

Resolved, that the ICSP recognizes the efforts of the National Standards Policy Advisory Committee (NSPAC) as a commendable contribution to the establishment and implementation of an effective U.S. national standards policy, and offers to work cooperatively with the private sector to achieve the NSPAC's stated objectives in a timely fashion. It should be noted, however, that the ICSP is disappointed at the delay of the private sector in implementing reforms such as contained in this policy, and would have preferred a stronger statement regarding duplication in the private sector and provided for a stronger central management structure in the private sector.

As a matter of further information it should be noted that the NSPAC report which was issued over a year before promulgation of OMB Circular A-119 on January 17, 1980, contains recommendations which may be at variance with certain of the policy statements and administrative directives in the Circular. For example, the NSPAC report recommends that the government should give preference in its procurement activities to standards prepared under the standards development process which NSPAC recommends be adopted. The Circular makes no such broad requirement, but only urges Federal departments and agencies to give preference, subject to their administrative discretion, to the use of voluntary standards in procurement actions.

As another example of variance, the NSPAC report recommends that there should be a Federal appeals procedure available for those importers or individuals who believe they have been or will be disadvantaged by a certain voluntary standard or the lack thereof. No distinction is made in that proposal as to whether the appeals procedure should be available to review both substantive and procedural matters. The Circular provides for a voluntary dispute resolution service which is limited to procedural issues.

In the light of such examples of variance it is suggested that anyone interested in the implementing recommendations contained in the NSPAC report would be well advised to compare them with the Federal policies and directives set forth in OMB Circular A-119.

Jordan J. Baruch,
Assistant Secretary for Productivity, Technology, and Innovation.
September 18, 1980.
[FR Doc. ... Filed ...]
BILLING CODE 3510-10-M

CONSUMER PRODUCT SAFETY COMMISSION

[Petition No. CP 77-7]

Football Helmets; Denial of Petition

AGENCY: Consumer Product Safety Commission.

ACTION: Denial of petition.

SUMMARY: The Commission denies a petition requesting it to issue a consumer product safety standard for football helmets in order to reduce the risks of head, neck, and spinal injuries which occur during football play. The Commission denies the petition because it does not believe that a mandatory standard is necessary at this time to reduce any risk of injury associated with football helmets. The Commission notes that a number of organizations are involved in voluntary standards development in this area. In addition, the rate of football deaths from head injuries and the incidence of such injuries have decreased in recent years due to such factors as rule changes against butting and spearing, improved coaching and officiating, and the use of helmets certified to meet voluntary standards.

FOR FURTHER INFORMATION CONTACT:
Douglas L. Noble, Office of Program Management, Consumer Product Safety Commission, Washington, D.C. 20207, 301-492-6443.

ADDRESS: Copies of the petition and staff's briefing materials on the petition may be obtained from the Office of the Secretary, Consumer Product Safety Commission, 1111 18th Street, N.W., Washington, D.C. 20207.

SUPPLEMENTARY INFORMATION:

1. Background

Section 10 of the Consumer Product Safety Act (CPSA), 15 U.S.C. § 2059, provides that any interested person may petition the Consumer Product Safety Commission (CPSC) to begin a proceeding to issue, amend, or revoke a consumer product safety standard or ban. Section 10 also provides that if the Commission denies such a petition, it shall publish its reasons for denial in the Federal Register.

By letter dated December 17, 1976, and supplemented by a letter dated January 24, 1977, Dr. A.C. Larcher of Chicago, Illinois petitioned (CP 77-7) the Commission to establish mandatory safety standards for football helmets and shoes. In his submission, Dr. Larcher claimed that the application of cylindrical air chambers covered by a softened plastic anterior shell on helmets would reduce head, neck, and spinal injuries.

On March 16, 1978 the Commission denied that part of the petition relating to football shoes on the basis that available information did not support a determination that the design of the shoes contributed to football injuries. (See 43 FR 9949). Action was deferred on that part of the petition relating to helmets because the Commission believed that further investigation by its staff was necessary before a decision on any mandatory standard for helmets could be made.

On January 15, 1980, Frederick Repsold requested that the Commission ban football helmets with a hard finish. This submission was treated as a statement in support of the petition, CP 77-7, in accordance with the Commission's petitioning regulations at 16 CFR 1051.6. The Commission also received, in April of 1977, a submission from Dungard, Inc. requesting the issuance of a consumer product safety rule for football helmets and accessory parts. This submission was similarly treated as a statement in support of CP 77-7.

2. Commission Evaluation of the Petition

In analyzing this petition, the Commission considered all available information, including injury data, mechanisms of head and neck injuries, human factors implications of injuries, and voluntary standards activities on football helmets.

The Commission reviewed several sources of injury data associated with organized football at the high school and college levels. The Commission also considered data from the Commission's National Electronic Injury Surveillance System (NEISS), which includes injuries associated with both organized and unorganized football. The Commission did not consider injury data associated with professional football since the Commission is only concerned with

04/25/01 09:30A P.007
FROM : WHO'S YOUR_DADDY?? FAX NO. : 2104922755 Apr. 25 2001 09:26AM P3

Federal Register / Vol. 45, No. 187 / Wednesday, September 24, 1980 / Notices     63327

[The body of this page is a photocopy of a Federal Register page that is too faded and blurred to transcribe reliably.]

Commission meeting and in the afternoon will meet with the Commissioners to discuss the subject of recalls. On Friday, members will be briefed on CPSC budget, priorities, and field plans for FY 81, and will plan their program for the year.

The meeting is open to the public; however, space is limited. Persons who wish to make oral or written presentation to the Product Safety Advisory Council should notify the Office of the Secretary (see address above) by October 3, 1980. The notification should list the name of the individual who will make the presentation, the person, the company, group or industry on whose behalf the presentation will be made, the subject matter, and the approximate time requested. Time permitting, these presentations and other statements from the audience to members of the Council may be allowed by the presiding officer.

Dated: September 19, 1980.

Sadye E. Dunn,

*Secretary, Consumer Product Safety Commission.*

[FR Doc. [illegible] Filed [illegible]]

BILLING CODE [illegible]

DEPARTMENT OF DEFENSE

Department of the Air Force

Scientific Advisory Board; Meeting

September 12, 1980.

The USAF Scientific Advisory Board Electronic Systems Division Advisory Group will hold meetings on October 17 from 8:00 a.m. to 5:00 p.m. and on October 18 from 8:30 a.m. to 12:00 p.m. at Hanscom Air Force Base, Massachusetts in the Command Management Center, Building 1606.

The Group will receive classified briefings and hold classified discussions on selected Air Force Command, Control, and Communications Programs. The meetings concern matters listed in section 552b(c) of Title 5, U.S.C., specifically paragraph (1) thereof, and will be closed to the public.

For further information contact the Scientific Advisory Board at (202) 697-8404.

Carol M. Rose,

*Air Force Federal Register Liaison Officer.*

[FR Doc. [illegible] Filed [illegible]]

BILLING CODE [illegible]

Scientific Advisory Board; Meeting

September 12, 1980.

The USAF Scientific Advisory Board Space Division Advisory Group will meet on October 30 & 31, 1980 at the Los Angeles Air Force Station, CA. The purpose of the meeting is to review Satellite Data Management, Global Positioning System Additional Uses, and Space Based Radar. The Group will meet from 8:00 a.m. to 4:30 p.m. each day.

The meeting concerns matters listed in Section 552b(c) of Title 5, United States Code, specifically subparagraph (1) thereof, and accordingly, will be closed to the public.

For further information contact the Scientific Advisory Board Secretariat at (202) 697-[illegible].

Carol M. Rose,

*Air Force Federal Register Liaison Officer.*

[FR Doc. [illegible] Filed [illegible]]

BILLING CODE [illegible]

DEPARTMENT OF ENERGY

Bonneville Power Administration

Dickey-Lincoln School Lakes Transmission EIS Project Draft Supplement; Availability of Draft Supplement

Notice is hereby given that the Bonneville Power Administration (BPA) for the Department of Energy, in compliance with the National Environmental Policy Act of 1969, has prepared and is distributing a Draft EIS Supplement on the transmission system for Dickey-Lincoln School Lakes project. This supplement assesses potential environmental impacts associated with construction of proposed additional transmission facilities from Moore Substation, near Littleton, New Hampshire, to Webster Substation, near Franklin, New Hampshire.

These additional facilities (substituted for the original section from Granite Substation near Montpelier, Vermont, to Essex Substation near Burlington, Vermont) permit greater flexibility for development of transmission lines south, east, or west, and were necessitated by changes in load growth and changes in anticipated generating plant construction plans for the region. Integration of generation from the Dickey-Lincoln School Lakes project into the New England power pool system can best be accomplished with a plan of service that includes the new extension. A map of the proposed transmission route is contained in the draft EIS supplement.

Copies of the draft supplement are available for public inspection at Department of Energy public document rooms located at:

Library, FOI—Public Reading Room 1E-190, Forrestal Building, 1000 Independence Avenue S.W., Washington, D.C.;

EPA, Washington, D.C., Office, Room 3262, Federal Building, 12th and Pennsylvania Avenue N.W., Washington, D.C.

Copies will also be located in 70 depositories in New England; a complete list appears in the draft supplement.

The draft supplement is being furnished to Federal, State, and local agencies with environmental expertise, and to those likely to be interested in, or affected by, the proposed program. Copies of the document are also being furnished to State and local clearinghouses and to other interested groups and individuals.

Single copies are available upon request: contact Timothy J. Murray, Assistant Project Manager for Environmental Studies, Bonneville Power Administration, P.O. Box 3621—ETMC, Portland, Oregon 97208.

Notice of public hearings on this document will be published in the *Federal Register* at a later date.

Dated at Washington, DC, this 18th day of September 1980.

George E. Bell,

*Assistant Administrator.*

[FR Doc. [illegible] Filed [illegible]]

BILLING CODE [illegible]

Economic Regulatory Administration

Canadian Crude Oil Allocation Program Allocation Notice for the Oct. 1 Through Dec. 31, 1980, Allocation Period

In accordance with the provisions of the Mandatory Canadian Crude Oil Allocation Regulations, 10 CFR Part 214, the Economic Regulatory Administration (ERA) of the Department of Energy (DOE) hereby issues the allocation notice specified in § 214.32 for the allocation period beginning October 1, 1980.

The Canadian National Energy Board (NEB) has informed ERA that, effective October 1, 1980, exports of crude oil from Canada will again be authorized on a quarterly basis. Therefore, in this notice, ERA lists the export levels of Canadian light and heavy crude oil for the months of October, November, and December 1980.

Redesignation of Priority Status

On April 17, 1980, the Department of Energy's Office of Hearings and Appeals (OHA) issued a Decision and order with respect to appeals filed by the Mobil Oil Corporation from four allocation notices